No. 22-1954

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————————

INGE BERGE,

*Plaintiff-Appellant,*

*v.*

SCHOOL COMMITTEE OF GLOUCESTER;
BEN LUMMIS, in his personal capacity;
ROBERTA A. EASON, in her personal capacity; and
STEPHANIE DELISI, in her personal capacity,

*Defendants-Appellees.*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

————————————

## BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS, INC., AND THE NEW ENGLAND FIRST AMENDMENT COALITION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND URGING REVERSAL

————————————

Alexandra Arnold (1st Cir. No. 1205706)
Ruth A. Bourquin (1st Cir. No. 13282)
Matthew R. Segal (1st Cir. No. 1151872)
American Civil Liberties Union
   Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
aarnold@aclum.org
rbourquin@aclum.org
msegal@aclum.org

**March 3, 2023**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amici curiae* the American Civil Liberties Union of Massachusetts, Inc., and the New England First Amendment Coalition certify that neither has a parent corporation and that no publicly held corporation owns 10% or more of either's stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................. i

Table of Authorities ................................................................................... iii

Introduction ............................................................................................... 1

Interests of Amici Curiae .......................................................................... 3

Background ................................................................................................ 4

Argument ................................................................................................... 8

    I.   Berge's publication of his video was constitutionally protected. .......... 8

        A.   The First Amendment protects the right to publish information on matters of public concern. ..................................................... 8

        B.   The right to publish may be subject to a narrow exception where the publisher broke a law that prohibits recording, and that law withstands First Amendment scrutiny. .............................. 11

        C.   Berge's publication of his video is protected by the First Amendment because it is on a matter of public concern, and he did not violate any law against recording it ........................... 15

    II.  Berge's right to publish was clearly established at the time of publication. ....... 17

        A.   Controlling case law provided fair and clear warning that threatening Berge with legal action under the Massachusetts wiretap statute if he did not "immediately remove" his recording, which was made in violation of no law, was contrary to the First Amendment. ......................... 18

        B.   Broader, clearly established Constitutional principles also provided such notice. .......................................................... 20

Conclusion ............................................................................................... 22

Certificate of Compliance ....................................................................... 23

Certificate of Service ............................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. al-Kidd,*
  563 U.S. 731 (2011) ................................................................17

*Bantam Books, Inc. v. Sullivan,*
  372 U.S. 58 (1971) ..................................................................9

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) ......................................................passim

*Barton v. Clancy,*
  632 F.3d 9 (1st Cir. 2011) .....................................................20

*CBS, Inc. v. Davis,*
  510 U.S. 1315 (1994) ............................................................10

*Citizens United v. FEC,*
  558 U.S. 310 (2010) ..............................................................21

*Connick v. Myers,*
  461 U.S. 138 (1983) ........................................................ 8, 15

*Cox Broad. Corp. v. Cohn,*
  420 U.S. 469 (1975) ...................................................1, 8, 10

*Curtatone v. Barstool Sports, Inc.,*
  487 Mass. 655 (2021) ............................................................15

*De Jonge v. State of Oregon,*
  299 U.S. 353 (1937) ................................................................8

*District of Columbia v. Wesby,*
  138 S. Ct. 577 (2018) ............................................................17

*Florida Star v. B.J.F.,*
  491 U.S. 524 (1989) ......................................................passim

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,*
  528 U.S. 167 (2000) ..............................................................19

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ..................................................9

*Garrison v. Louisiana,*
  379 U.S. 64 (1964) ..................................................................8

*Gertz v. Robert Welch, Inc.,*
  418 U.S. 323 (1974) ..............................................................14

*Glik v. Cunniffe,*
    655 F.3d 78 (1st Cir. 2011) ............................................................................passim

*Grosjean v. Am. Press Co.,*
    297 U.S. 233 (1936) ............................................................................ 1, 8

*Hammerhead Enters., Inc. v. Brezenoff,*
    707 F.2d 33 (2d Cir. 1983) ................................................................21

*Hartman v. Moore,*
    547 U.S. 250 (2006) ..........................................................................20

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ..........................................................18, 20, 21

*Houchins v. KQED, Inc.,*
    438 U.S. 1 (1978) ..............................................................................14

*Jean v. Massachusetts State Police,*
    492 F.3d 24 (1st Cir. 2007) ...........................................................passim

*Landmark Comm'ns, Inc. v. Virginia,*
    435 U.S. 829 (1978) .......................................................................... 2, 10

*Lovell v. City of Griffin,*
    303 U.S. 444 (1938) ............................................................................8

*Marceaux v. Lafayette City-Parish Consol. Gov't,*
    731 F.3d 488 (5th Cir. 2013) .............................................................9

*Miami Herald Publ'g Co. v. Tornillo,*
    418 U.S. 241 (1974) ............................................................................ 1, 8

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) ............................................................................8

*Near v. Minnesota,*
    283 U.S. 697 (1931) ............................................................................ 1, 8

*Nebraska Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ........................................................................1, 8, 9

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ........................................................................1, 7, 8

*New York Times Co. v. United States (Pentagon Papers),*
    403 U.S. 713 (1971) .......................................................................1, 2, 8, 21

*Nisselson v. Lernout,*
    469 F.3d 143 (1st Cir. 2006) ..............................................................4

*Norris v. Cape Elizabeth School Dist.*,
    969 F.3d 12 (1st Cir. 2020) ........................................................16

*Oklahoma Publ'g Co. v. Oklahoma Cnty. Dist. Ct.*,
    430 U.S. 308 (1977) ............................................................... 1, 8

*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003) .......................................................21

*Org. for a Better Austin v. Keefe*,
    402 U.S. 415 (1971) ............................................................ 1, 8, 9

*Plumhoff v. Rickard*,
    572 U.S. 765 (2014) ..................................................................17

*Project Veritas Action Fund v. Rollins*,
    982 F.3d 813 (1st Cir. 2020) .........................................................4

*Schneider v. New Jersey*,
    308 U.S. 147 (1939) ............................................................ 1, 7, 8

*Smith v. Daily Mail Publ'g Co.*,
    443 U.S. 97 (1979) .............................................................passim

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ..................................................................15

*Trans-Spec Truck Service, Inc. v. Caterpillar Inc.*,
    524 F.3d 315 (1st Cir. 2008) .........................................................4

*United States v. Aguilar*,
    515 U.S. 593 (1995) ..................................................................20

*United States v. Lanier*,
    520 U.S. 259 (1997) ............................................................ 17, 21

*White v. Pauly*,
    580 U.S. 73 (2017) ...................................................................17

*Wood v. Strickland*,
    420 U.S. 308 (1975) ..................................................................17

*Zieper v. Metzinger*,
    62 F. App'x. 383 (2d Cir. 2003) ...................................................21

**Statutes**

Mass. Gen. Laws ch. 272, § 99 ........................................................... 3, 15

**Constitutional Provisions**

U.S. Const. amend. I ..............................................................................7

# INTRODUCTION

The First Amendment right to publish information of public concern free from government censorship has long been clearly established. *See New York Times Co. v. United States* (*Pentagon Papers*), 403 U.S. 713 (1971).[1] This right "lies at the foundation of free government." *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939). And it unquestionably applies when the government has not passed any law even purporting to prohibit the publication at issue. *Jean v. Massachusetts State Police*, 492 F.3d 24, 30–33 (1st Cir. 2007). Yet the court below dismissed this action—which challenges the defendants' efforts to coerce Inge Berge into withdrawing from publication information of public concern that he openly recorded in violation of no law—based on its conclusion that Berge's right to publish was not clearly established. That ruling was incorrect and should be reversed.

Both the Supreme Court and this Court have repeatedly made clear that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Daily Mail*, 443 U.S. at 102. "[T]he press," including citizen journalists, "must be left free to publish news, whatever the source, without

---

[1] *See also Florida Star v. B.J.F.*, 491 U.S. 524 (1989); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979); *Oklahoma Publ'g Co. v. Oklahoma Cnty. Dist. Ct.,* 430 U.S. 308 (1977); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974); *Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971); *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936); *Near v. Minnesota*, 283 U.S. 697 (1931).

censorship, injunctions, or prior restraints." *Pentagon Papers*, 403 U.S. at 717 (Black, J., concurring); *see also Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (First Amendment protections "cannot turn on professional credentials or status"). When information involves a matter of public concern, the First Amendment protects publishers from both prior restraint and subsequent punishment, absent a demonstrated need to vindicate a state interest of the "highest order." *Daily Mail*, 443 U.S. at 103; *see also Florida Star*, 491 U.S. at 537–41; *Landmark Comm'ns, Inc. v. Virginia*, 435 U.S. 829, 841–42 (1978). This right is so firmly entrenched that even when someone publishes a recording "knowing that [it] was illegally intercepted," that "knowing disclosure is protected by the First Amendment." *Jean*, 492 F.3d at 32 (citing *Bartnicki v. Vopper*, 532 U.S. 514 (2001)).

The right to publish even illegally intercepted recordings, recognized in *Bartnicki* and *Jean*, is potentially subject to a narrow exception when the publisher—not just the interceptor or original recorder—"illegally" or "unlawfully" acquired the recording. *Bartnicki,* 532 U.S. at 517, 528.  But even then, it is not enough to show a violation of some statute; the state may not punish the publisher unless "the First Amendment . . . permits [the state] to criminalize [the publisher's] conduct." *Jean*, 492 F.3d at 31. And as the Court recognized in *Jean,* the First Amendment does not allow punishment of the distribution of a recording where the publisher was not complicit in an illegal interception. *Id.* at 32–33.

This case involves alleged conduct that falls well within the clearly established right to publish, rather than the narrow exception articulated in *Bartnicki* and *Jean*. Berge openly recorded a video in a public building. His recording was not "illegal" or "unlawful" under any law. It certainly did not violate the Massachusetts wiretap statute, Mass. Gen. Laws ch. 272, § 99, which applies only to "secret" recordings and was the only law cited in the threatening letter sent to Berge by Gloucester school district officials. Berge therefore had a clearly established First Amendment right to publish the video he openly and lawfully recorded. And because Berge's act of recording was lawful, he had a clearly established First Amendment right to publish that recording, regardless of whether he also had an affirmative First Amendment right to record it. Because the district court concluded otherwise, its dismissal of the complaint as to the right to publish should be overturned.[2]

## INTERESTS OF AMICI CURIAE

The **American Civil Liberties Union of Massachusetts, Inc.** (ACLUM) is a statewide nonprofit membership organization dedicated to the principles of liberty and equality embodied in the constitutions and laws of Massachusetts and the United States. ACLUM has frequently appeared before this Court and others in support of

---

[2] *Amici curiae* takes no position on whether there is a constitutional right to record in the public building at issue.

First Amendment rights. *See, e.g.*, *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 817 (1st Cir. 2020); *Glik*, 655 F.3d 78; *Jean*, 492 F.3d 24.

The **New England First Amendment Coalition** (NEFAC) is the region's leading advocate for First Amendment freedoms and the public's right to know about government. The coalition is a non-partisan non-profit organization that believes in the power of transparency in a democratic society. Its members include lawyers, journalists, historians, academics, and other private citizens. NEFAC frequently files and joins amicus briefs in cases of First Amendment and open government significance, including many before this court.[3]

## BACKGROUND[4]

On March 3, 2022, Berge entered a Gloucester school district administrative building to speak with public officials about the district's COVID-19 policies, based

---

[3] In accordance with Fed. R. App. P. 29(a)(4)(E), *amici curiae* certify that (1) this brief was authored entirely by counsel for *amici curiae* and not counsel for any party, in whole or in part; (2) no party or counsel for any party contributed money to preparing or submitting this brief; and (3) no person other than *amici curiae* contributed money to the preparation or submission of this brief.

Fed. R. App. P. 29(a)(2) authorizes this filing, as counsel for all parties have consented.

[4] This factual summary is derived from Berge's amended complaint and his recording of the encounter, which is incorporated by reference, R.A. 22, ¶ 15, fn.1, and on which the district court relied, Pl.'s App. 3. *See Trans-Spec Truck Service, Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) (internal quotations omitted) ("Exhibits attached to the complaint are properly considered part of the pleading for all purposes, including Rule 12(b)(6)"). As required at this stage in the proceedings, the

on his view that those policies were impeding his ability to buy tickets to his daughter's middle school play. R.A. 22, ¶¶ 8–9; Inge Berge, FACEBOOK (Mar. 3, 2022), https://www.facebook.com/inge.berge.9/videos/1571702173204109 ("Recording") at 0:00–1:35. Berge openly filmed the events inside the office: he kept his camera clearly on display, and he informed the officials he met that he was recording the interaction. R.A. 22, ¶ 11; Recording at 1:49–1:55. No signs prohibited or even discouraged his recording in the publicly accessible portion of the administrative building. R.A. 22, ¶ 10.

Berge was initially directed to Stephanie Delisi, the school district's executive secretary. *Id.* at ¶ 12; Recording at 1:36–1:48. He began the conversation by informing her that he was filming. R.A. 22, ¶ 12; Recording at 1:49–1:55. Delisi said that she personally did not wish to be recorded and entered a private office. Recording at 1:56–2:11. Ben Lummis, the school district superintendent, then talked briefly with Berge, asked Berge to turn off his camera, and stated, "You do not have my permission to film here," as he was retreating into a private office. *Id.* at 2:19–2:43. A third official, Gregg Bach, then approached Berge and engaged him in a pleasant conversation for several minutes about his attempts to attend his daughter's play. R.A. 22–23, ¶ 14; Recording at 3:30–7:51. Berge openly filmed their entire conversation,

---

summary assumes "the truth of all well-pleaded facts." *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006).

and Bach expressed no objection. R.A. 22–23, ¶ 14; Recording at 3:30–7:51. Berge then left the building. R.A. 22–23, ¶ 14; Recording at 7:52–8:00.

Later that day, Berge uploaded the video to Facebook, along with his commentary. R.A. 23, ¶ 15. The same day, Berge received a letter from Roberta Eason, the school district's director of human resources, which claimed that Berge had violated the Massachusetts wiretap statute by recording his conversation with Delisi without her consent and uploading the video to Facebook. *Id.* at ¶ 16. The letter demanded that Berge "immediately remove" the video or the school district would take legal action against him. *Id.* at ¶ 17.

Via a complaint filed on March 7, 2022, *id.* at 1–6, and subsequently amended on March 17, 2022, *id.* at 21–29, Berge brought suit against the school committee, Delisi, Eason, and Lummis. Count I of the amended complaint alleges that Berge had First Amendment rights both to record and to publish his video and that the defendants' letter of March 3, 2022, impermissibly retaliated against his exercise of those rights, in violation of 42 U.S.C. § 1983. *Id.* at 25–26, ¶¶ 29–39. Count IV seeks a declaration that he had a right to publish regardless of whether he had a First Amendment right to record. *Id.* at 28, ¶¶ 57–61. The complaint seeks declaratory and injunctive relief as well as damages. *Id.* at 28.

 On March 11, 2022, counsel for the school district advised Berge's counsel over the phone that the district had "withdrawn" its threatening letter. *Id.* at 79. The district sent a follow-up letter to that effect on March 22, 2022. *Id.*

The defendants next sought, and the district court granted, dismissal of Berge's amended complaint. Pl.'s Add. 1–16. As to the section 1983 claim, the court's analysis proceeded in two steps. First, it dismissed the portions of the claim asserting that Berge had a First Amendment right to record his encounter with the Gloucester officials because, in the court's view, Berge had abandoned that assertion during settlement negotiations with opposing counsel. *Id.* at 6–7. Thus, the court did not reach the merits of any claim by Berge that he had a First Amendment right to record his video. Second, the court dismissed the portions of the section 1983 claim asserting that Berge had a right to publish the recording because, in the court's view, the individual defendants were entitled to qualified immunity. *Id.* at 7–12. In support of that ruling, the court relied solely on a conclusion that Berge had failed to show "an established rule relevant to the particular facts of this case[.]" *Id.* at 9; *see also id.* at 12 (concluding that Berge failed "to show that his right to publish his video was clearly established").

Turning to the claims for declaratory relief, the court found Berge's claims moot based on the March 22, 2022 communication withdrawing the threatening letter. *Id.* at 12–15. The court discounted the possibility that the controversy might repeat itself if Berge continued to record and publish videos based on Berge's supposed "conce[ssion] that he has no First Amendment right to record" in school district administrative buildings. *Id.* at 13.

# ARGUMENT

## I.　　Berge's publication of his video was constitutionally protected.

### A.　*The First Amendment protects the right to publish information on matters of public concern.*

The First Amendment prohibits government actions "abridging the freedom of speech, or of the press," U.S. Const. amend. I, and encompasses "the freedom[s] to speak, write, print [and] distribute information or opinion," *Schneider*, 308 U.S. at 161. These guarantees reflect a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *Sullivan*, 376 U.S. at 270. Indeed, the Supreme Court "has characterized the freedom of speech and that of the press as fundamental personal rights and liberties" that "lie[] at the foundation of free government." *Schneider*, 308 U.S. at 161 (citing *Grosjean*, 287 U.S. at 244; *De Jonge v. State of Oregon*, 299 U.S. 353, 364 (1937); and *Lovell v. City of Griffin*, 303 U.S. 444, 450 (1938)).

The First Amendment's protections are at their zenith with respect to matters of public concern. Given the "paramount public interest in a free flow of information to the people concerning public officials, their servants," *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964), "the Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)).

Guided by these principles, the Supreme Court has articulated a robust First Amendment right to publish information—even stolen information—and has safeguarded that right against government intrusion. *See e.g.*, *Florida Star*, 491 U.S. 524; *Daily Mail*, 443 U.S. 97; *Oklahoma Publ'g Co.,* 430 U.S. 308; *Nebraska Press Ass'n*, 427 U.S. 539; *Cox Broad. Corp.*, 420 U.S. 469; *Miami Herald*, 418 U.S. 241; *Org. for a Better Austin*, 402 U.S. 415; *Pentagon Papers*, 403 U.S. 713; *Sullivan*, 376 U.S. 254; *Grosjean*, 297 U.S. 233; *Near*, 283 U.S. 697. In *Pentagon Papers*, the Court refused to enjoin the *New York Times* from publishing the contents of a classified government report, even though it had been stolen by a third party and given to the newspaper in violation of federal espionage statutes. 403 U.S. 713 (per curiam). Four years later, in *Nebraska Press Ass'n v. Stuart*, the Court unanimously vacated a state trial judge's order prohibiting pretrial publication of a defendant's confessions to the murder of his family. 427 U.S. at 569–70. In doing so, the Court stressed that "prior restraints on speech and publication are the most serious and the least tolerable infringement on first amendment rights" and can be justified only where the government carries its "heavy burden of showing justification for the imposition of such a restraint." *Id.* at 558–59.

The First Amendment right to publish protects against not only prior restraints on the initial publication of information but also curtailments of the information's ongoing distribution. In *Org. for a Better Austin v. Keefe*, for example, the Court struck down an order enjoining the continued distribution of flyers. 402 U.S. at 417–18.

9

Similarly, the Fifth Circuit vacated a protective order requiring that a website be "taken down" to avoid prejudicing litigants. *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493–94 (5th Cir. 2013). And the Ninth Circuit vacated a "takedown order of a film of substantial interest to the public," finding that the order was "a classic prior restraint of speech." *Garcia v. Google, Inc.*, 786 F.3d 733, 747 (9th Cir. 2015) (en banc). So, even where the information at issue has already reached the public, government action intended to prevent its continuing publication carries "a 'heavy presumption' against its constitutional validity." *Org. for a Better Austin*, 402 U.S. at 419 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1971)).

The Supreme Court has repeatedly emphasized that only a government interest of the "highest order" can overcome the First Amendment right to publish. *Daily Mail*, 443 U.S. at 103. Indeed, the Court has never upheld a restraint on pure speech and has recognized the theoretical possibility of doing so in only the most exceptional of circumstances. *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (internal quotations omitted) ("the gagging of publication has been considered acceptable only in exceptional cases"). For the same reasons, the Court has made clear that the government cannot *sanction* protected publication, absent a demonstrated need to vindicate a compelling state interest. *See, e.g.*, *Florida Star*, 491 U.S. at 526, 538 (reversing damages award to victim of sexual assault who had sued newspaper for publishing her name, where government official had placed victim's name in public domain); *Daily Mail*, 443 U.S. at 98, 105–06 (striking down West Virginia statute that

10

criminalized printing names of alleged juvenile offenders in any newspaper without prior approval from juvenile court); *Landmark Comm'ns*, 435 U.S. at 830–31, 838 (striking down Virginia law restricting publication of information pertaining to confidential proceedings before judicial review commission and noting that publication of information concerning governmental affairs is "near the core of the First Amendment"); *Cox Broad. Corp.*, 420 U.S. at 471–72, 487–89 (holding that Georgia could not penalize publication of name of rape victim, where victim's name had been obtained from public records open to public inspection).

In short, the Court has repeatedly addressed government restraints on or sanctions against the publication of information on matters of public concern. And it has consistently held that such intrusions violate the First Amendment.

B.    *The right to publish may be subject to a narrow exception where the publisher broke a law that prohibits recording, and that law withstands First Amendment scrutiny.*

The Supreme Court and this Court have articulated the possibility of a narrow exception to the right to publish information on a matter of public concern where the publisher was complicit in recording the information in violation of a valid law.

In *Bartnicki*, the Supreme Court considered the application of federal and state wiretap laws to the intentional disclosure of an illegally intercepted call between a teachers' union president and the union's chief negotiator, Sharon Bartnicki. 532 U.S. at 527–35. Jack Yocum, the head of a local taxpayers' organization that opposed the union, had found a recording of the call in his mailbox. *Id.* at 519. Yocum delivered it

to Frederick Vopper, a radio commentator, who played it repeatedly on air. *Id.*
Bartnicki sued them, as well as other members of the media. *Id.* at 519–20. The
statutes at issue defined several criminal offenses, including (1) willfully intercepting
any wire or oral communications, (2) using the contents of interceptions, and (3)
intentionally disclosing the contents of an electronic communication while "knowing
or having reason to know that the information was obtained" through an illegal
interception. *Id.* at 523–24. While the prohibitions against willful interceptions and
unlawful use validly regulated conduct, the Court concluded that "the naked
prohibition against disclosures [wa]s fairly characterized as a regulation of pure
speech." *Id.* As a result, it was subject to strict scrutiny. *Id.* at 528.

The federal government, which intervened to defend the constitutionality of
the federal statute, advanced two interests: "first, the interest in removing an incentive
for parties to intercept private conversations, and second, the interest in minimizing
the harm to persons whose conversations have been illegally intercepted." *Id.* at 529.
Although the Court acknowledged that the case presented "a conflict between
interests of the highest order—on the one hand, the interest in the full and free
dissemination of information concerning public issues, and on the other hand, the
interest in individual privacy and, more specifically, in fostering private speech," *id.* at
518—it nevertheless concluded that the government had failed to meet its burden, *id.*
at 529–35. Even if the government's asserted interests justified prohibiting the
interceptor's own use of information, "it by no means follow[ed]" that they justified

"punishing disclosures of lawfully obtained information of public interest by one not involved in the initial illegality." *Id.* at 529. And where Yocum and Vopper had not themselves participated in the unlawful interception, the Court concluded that the statutes could not prohibit the publication of the information on a matter of public concern. *Id.* at 533–35. Indeed, the Court left open the question whether the publication, as opposed to the acquisition, of information on a matter of public concern could *ever* be punished—even where the publisher was involved in the unlawful interception. *Id.* at 528–29; *see also Florida Star*, 491 U.S. at 535 n.8.

This Court applied the principles of *Bartnicki* in *Jean*. Mary Jean, a political activist, posted a recording on the Internet of a state police search of a private home. *Jean*, 492 F.3d at 25–26. Jean had received the recording from the home's owner, and for purposes of the appeal, this Court assumed not only that the homeowner's creation of the recording violated the Massachusetts wiretap statute but also that Jean's conduct may have been prohibited by the statute because "[s]he disclosed to others the contents of an oral communication that she knew had been recorded illegally, and she arguably participated with [the homeowner] in a conspiracy to disclose the content of the illegally recorded oral communication." *Id.* at 31. After Jean posted the recording online, the state police told her that if she did not "cease and desist" from publication, they would refer the matter for possible prosecution. *Id.* at 25–26. Jean sued, claiming a First Amendment right to post the recording. *Id.* at 26.

13

This Court upheld a preliminary injunction enjoining the state police from interfering with Jean's publication. *Id.* at 25. Applying *Bartnicki*, and notwithstanding its assumption that the wiretap statute may otherwise have made the publication unlawful, *id.* at 31, the Court concluded that Jean's publication was entitled to First Amendment protection, *id.* at 33. The Court explained that the government had only a weak interest in preventing the publication, outweighed by the public interest in permitting publication of truthful information on a matter of public concern. *Id.* at 29–33. This Court stated further that the state's asserted "interest in protecting private communication" was "virtually irrelevant" where the interception involved the conduct of public officials—there, police officers whose conduct in a private home was recorded by the residents. *Id.* at 30.[5] And most importantly for this case, it concluded that because "Jean played no part in [any] illegal interception," *id.,* the publication "was protected by the First Amendment." *Id.* at 33.

---

[5] As the Supreme Court remarked in *Bartnicki*, "one of the costs associated with participation in public affairs is an attendant loss of privacy." 532 U.S. at 534. And many other courts have similarly pointed out that those who volunteer themselves for public office have a diminished privacy interest when balanced against the First Amendment freedoms of speech and of the press. *See e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344 (1974) ("An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case"); *Glik*, 655 F.3d at 82 (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978)) ("[T]here is an undoubted right to gather news 'from any source by means within the law.' . . . The filming of government officials engaged in their duties in a public place . . . fits comfortably within these principles").

Both *Bartnicki* and *Jean* therefore clearly establish that where individuals are not involved in creating a recording in violation of law, their publication of any such recording on a matter of public concern is entitled to First Amendment protection.

C.    *Berge's publication of his video is protected by the First Amendment because it is on a matter of public concern, and he did not violate any law against recording it.*

Berge's publication of his video falls squarely within the scope of the First Amendment right to publish information on a matter of public concern because there is no argument that Berge, at any time, violated any law.

To begin with, Berge's recording indisputably involves a matter of public concern. Generally speaking, "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick*, 461 U.S. at 146). The impact of a school district's COVID-19 policies plainly falls within those bounds.

Moreover, there is no argument that Berge did anything "unlawful" by making or publishing the recording. Berge alleges, and the recording shows, that he was recording public officials discharging their public duties in the publicly accessible area of a public building; that his camera was on display throughout his interactions with Delisi and other officials; and that he made clear to the officials that he was recording. Although the school district's demand letter to Berge invoked the Massachusetts wiretap statute, that law is irrelevant: it prohibits only "secret" audio recordings,

which Berge's recording clearly was not. *See* Mass. Gen. Laws ch. 272, § 99 (defining an "interception" as a "secret" recording); *Curtatone v. Barstool Sports, Inc.*, 487 Mass. 655, 658 (2021) ("If recordings are not made 'secretly,' they do not constitute an interception within the meaning of the act"); *Glik*, 655 F.3d at 87 (holding that "the secrecy inquiry turns on notice, i.e., whether, based on objective indicators, such as the presence of a recording device in plain view, one can infer that the subject was aware that she might be recorded").

Attempting to avoid this straightforward analysis, the school district suggested in support of its motion to dismiss that it has some undisclosed policy against recording in its offices and that this undisclosed policy "serves significant governmental interests." R.A. 44–46. Even if such a policy existed, that would not make the recording "unlawful" as required to fall within the potential *Bartnicki* and *Jean* exception to the right to publish. A mere policy does not a law make.

But even if the district's asserted policy were not irrelevant as a matter of law, at the motion to dismiss stage, it would still be irrelevant as a matter of fact. The amended complaint, which must be accepted as true at this point in the proceedings, does not allege the existence of any such policy. Nor was such a policy mentioned in the demand letter sent to Berge. Although the amended complaint and video do suggest that Lummis vaguely stated, as he was entering a private office, that Berge did not have his "permission" to record "here," the extemporaneous statement of a government official does not establish a policy of any kind. So, on the present record,

any government interest asserted by the defendants is at best, an interest in a policy that the school district belatedly wishes it had promulgated. Such post-hoc rationales developed in litigation cannot be used to justify speech restrictions. *See Norris v. Cape Elizabeth School Dist.*, 969 F.3d 12, 25–28 (1st Cir. 2020).

In sum, Berge recorded a video that captured his interactions with public officials on a matter of public concern without breaking any law. He then published that video on Facebook. There can be no question that the publication was protected under the First Amendment.

## II.    Berge's right to publish was clearly established at the time of publication.

The district court's grant of qualified immunity was incorrect because Berge's right to publish his video was clearly established in March 2022. For purposes of qualified immunity, a right is clearly established when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). This ensures that public officials are subject to liability only when the law provides "fair and clear warning" of what the Constitution requires. *United States v. Lanier*, 520 U.S. 259, 271 (1997).[6]

---

[6] Qualified immunity, even when warranted, of course applies only to claims for damages and not to requests for declaratory or injunctive relief. *See Wood v. Strickland*, 420 U.S. 308, 314 n.6 (1975) ("immunity from damages does not ordinarily bar equitable relief as well"), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

Fair and clear warning can be established in two ways. First, factually similar cases may give officials notice that their specific conduct would violate a constitutional right. *See White v. Pauly*, 580 U.S. 73, 79 (2017). Second, even without a "case directly on point," the existence of a broader, clearly established principle may place the unlawfulness of the conduct "beyond debate." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In effect, the conduct may be so obviously unconstitutional that general constitutional principles already expressed in precedent suffice to give officials the requisite notice. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Both tests are satisfied here.

> A.     *Controlling case law provided fair and clear warning that threatening Berge with legal action under the Massachusetts wiretap statute if he did not "immediately remove" his recording, which was made in violation of no law, was contrary to the First Amendment.*

All of the key cases discussed above were decided well before the conduct at issue here and clearly established both Berge's right to publish his recording and the inapplicability of the potential exception articulated in *Bartnicki* and *Jean*. *Bartnicki*, decided in 2001, established that the publication of a recording on a matter of public concern cannot be punished when the publisher was not involved in any "unlawful" conduct in connection with recording. 532 U.S. at 529–30. *Jean*, decided in 2007, established that public officials violate the constitution when they threaten members of the public with legal action based on supposed wiretap violations for publishing information on matters of public concern when those individuals did nothing "illegal"

18

with regard to the creation of the recording. 492 F.3d at 29–33. And since at least 2011, the law has been clearly established that only "secret" recordings violate the Massachusetts wiretap statute. *Glik*, 655 F.3d at 87–88.

The district court's contrary conclusion appears to rest on two errors. First, the court did not give appropriate weight to or even cite *Pentagon Papers*, *Bartnicki*, *Jean*, or other key cases on the right to publish on matters of public concern.[7] Second, the court's opinion indicates that it may have been under the impression that Berge's constitutional right to *publish* the video was unclear because, according to the court, Berge abandoned any claim that he had a constitutional right to *create* the video in the first place. Pl.'s App. 6–7, 15. But the right to publish does not depend on a constitutionally protected right to record. *Bartnicki* and *Jean* clearly establish that in the absence of any law even purporting to make the publisher's conduct "illegal" or "unlawful," the publisher has a right to publish without needing to prove that the recording was affirmatively protected by the First Amendment. *Bartnicki*, 532 U.S. at 533–35; *Jean*, 492 F.3d at 31–33.[8]

---

[7] Berge's opposition to the defendants' motion to dismiss cited *Bartnicki* and explained why the exception is not applicable to this case. *See* R.A. 66–67, 73. And the defendants cited *Jean*. R.A. 47.

[8] For similar reasons, the district court erred in dismissing Berge's claims for declaratory relief as moot. At most, during and for purposes of settlement discussions, Berge agreed not to press his right-to-record claim. R.A. 81. There is a serious question whether that settlement position can properly be conflated with

B.    *Broader, clearly established Constitutional principles also provided such notice.*

This is also an "obvious" case of a First Amendment violation. *See Hope*, 536 U.S. at 741. The Supreme Court and the First Circuit have, for decades, recognized that "the government may not generally restrict individuals from disclosing information that lawfully comes into their hands in the absence of a 'state interest of the highest order.'" *United States v. Aguilar*, 515 U.S. 593, 605 (1995) (quoting *Daily Mail*, 443 U.S. at 103).[9] "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to

---

abandonment of the claim. But even absent a claim of a constitutional right to record, Berge has asserted an intention to record and publish such videos again, R.A. 27–28, and the defendants have given no indication that they would not again assert that he has no right to publish any resulting recordings; indeed, they imply the contrary, R.A. 47. Accordingly, "the possibility that this entire situation will be repeated after dismissal" is not so remote, absent a declaration that Berge's publications are not in violation of the wiretap statute or other law and are therefore constitutionally protected. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190 (2000) (only when voluntary cessation of challenged conduct is *permanent*—i.e., when "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"—can it moot a case).

[9] In *Aguilar*, the Supreme Court held that the First Amendment did not give a federal judge, who obtained information about an investigative wiretap from another judge, the right to disclose that information to the subject of the wiretap. 515 U.S. at 605–06. In so holding, the Court explained that the judge was not "simply a member of the general public who happened to lawfully acquire possession of information about the wiretap; he was a Federal District [] Judge who learned of a confidential wiretap application from the judge who had authorized the interception, and who wished to preserve the integrity of the court. Government officials in sensitive confidential positions may have special duties of non-disclosure." *Id.* No such special duty not to disclose information lawfully acquired while working in a position of public trust applies to Berge.

retaliatory actions . . . for speaking out[.]" *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

Any form of official retaliation that would "deter a reasonably hardy individual in the

exercise of his or her First Amendment rights" therefore constitutes an infringement

on that protected freedom. *Barton v. Clancy*, 632 F.3d 9, 30 (1st Cir. 2011).

　　Other circuits have also made clear that government officials may not retaliate

against protected speech through threats or coercion:

> A public-official defendant who threatens to employ coercive state power to
> stifle protected speech violates a plaintiff's First Amendment rights, regardless
> of whether the threatened punishment comes in the form of the use (or,
> misuse) of the defendant's direct regulatory or decisionmaking authority over
> the plaintiff, or in some less-direct form.

*Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003). *See also Zieper v. Metzinger*, 62 F.

App'x. 383 (2d Cir. 2003) (holding that law was clearly established that First

Amendment violation occurred when officers "coerced" plaintiffs into suppression of

film); *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) ("Where

comments of a government official can reasonably be interpreted as intimating that

some form of punishment or adverse regulatory action will follow the failure to

accede to the official's request, a valid [prior restraint] claim can be stated").

　　Simply put, reasonable government officials understand that they cannot seek

to censor or suppress speech about the government that they dislike. *Pentagon Papers*,

376 U.S. at 269–70. That is a principle of constitutional bedrock. *See Citizens United v.*

*FEC*, 558 U.S. 310, 353 (2010) ("The First Amendment . . . was understood as a

response to the repression of speech and the press that had existed in England and

the heavy taxes on the press that were imposed in the Colonies"). And it applies with "obvious clarity to the specific conduct in question." *Hope*, 536 U.S. at 741 (quoting *Lanier*, 520 U.S. at 271).

## CONCLUSION

The right to publish information on a matter of public concern so long as the publisher did not violate a law making it "unlawful" or "illegal" to record that information in the first place was clearly established at the time of the events at issue. This Court should therefore reverse the district court's rulings on qualified immunity as to Berge's claim for damages and on mootness as to his claim for declaratory relief regarding his right to publish the recording.

Respectfully submitted,

/s/ Alexandra Arnold

Alexandra Arnold (1st Cir. No. 1205706)
Ruth A. Bourquin (1st Cir. No. 13282)
Matthew R. Segal (1st Cir. No. 1151872)
American Civil Liberties Union
   Foundation of Massachusetts, Inc.
One Center Plaza, Suite 850
Boston, MA 02108
(617) 482-3170
aarnold@aclum.org
rbourquin@aclum.org
msegal@aclum.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), I certify as follows:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,927 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

March 3, 2023                                   /s/ Alexandra Arnold

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of March 2023, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit. I certify further that all participants in the case are registered CM/ECF users and that service will be accomplished through the appellate CM/ECF system.

March 3, 2023                                   /s/ Alexandra Arnold