# United States Court of Appeals
## For the First Circuit

No. 22-1954

INGE BERGE,

Plaintiff, Appellant,

v.

SCHOOL COMMITTEE OF GLOUCESTER; BEN LUMMIS, in his personal
capacity; ROBERTA A. EASON, in her personal capacity; and
STEPHANIE DELISI, in her personal capacity,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Angel Kelley, District Judge]

Before

Barron, Chief Judge,
Thompson and Montecalvo, Circuit Judges.

Marc J. Randazza, with whom Jay M. Wolman, Robert J. Morris
II, and Randazza Legal Group, PLLC were on brief, for appellant.
John J. Davis, with whom Pierce Davis & Perritano LLC was on
brief, for appellees.
Anna J. Goodman, Jaba Tsitsuashvili, Patrick Jaicomo, Anna
Bidwell, Institute for Justice, Ronald London, and Foundation for
Individual Rights and Expression, amici curiae.
Alexandra Arnold, Ruth A. Bourquin, Matthew R. Segal,
American Civil Liberties Union Foundation of Massachusetts, Inc.,
and The New England First Amendment Coalition, amici curiae.
Jennifer Safstrom, Stanton Foundation First Amendment Clinic
at Vanderbilt Law School, Mickey H. Osterreicher, and National
Press Photographers Association, amici curiae.

July 15, 2024

THOMPSON, **Circuit Judge**.

## PREFACE

Among the many issues before us, the headline-grabbing one is this: On a motion to dismiss a case, see Fed. R. Civ. P. 12(b)(6), does qualified immunity protect public officials who baselessly threatened a citizen-journalist with legal action if he did not remove a video on a matter of public concern that he made and posted on Facebook without breaking any law?[1] We answer no, for reasons shortly stated (we also address some perhaps-less-exciting-but-still-very-important mootness questions before signing off).

## HOW THE CASE CAME TO US

Accepting the facts in the complaint and incorporated materials as true and relying on concessions made in the opposition to the motion to dismiss, see, e.g., Eves v. LePage, 927 F.3d 575, 578 n.2 (1st Cir. 2019); Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55-56 (1st Cir. 2012), the following story unfolds.

---

[1] Anyone wishing to see the recording can go to Inge Berge, Facebook (Mar. 3, 2022, 1:37 PM), https://www.facebook.com/inge.berge.9/videos/1571702173204109. And just as a heads-up for the legal neophytes out there, qualified immunity gives officials cover when they decide close questions in reasonable (even if ultimately wrong) ways — sparing them from money-damages liability *unless* they violated a statutory or constitutional right that was clearly established at the time (much more on all that soon). See, e.g., Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011).

**Encounter**

Inge Berge is a citizen-journalist living in Gloucester, Massachusetts.[2]  Back in early March 2022, he went to the city's school superintendent's office — which is open to the public (during specified hours, we presume).  He wanted to buy tickets to his daughter's sold-out school play.  And he wanted to hear from officials why the school's COVID-19 rules still capped the number of play-goers when the state had already lifted its COVID-19 mandates by then.

Visibly filming as he went along (he kept his camera out for all to see), Berge made sure to also tell everyone he met that he was recording.  And no sign banned or restricted filming in the building's publicly accessible areas either.

Talking to executive secretary Stephanie Delisi, Berge said, "I'm filming this.  I'm doing a story on it.  If that's okay with you."  "No, no I don't want to be filmed," Delisi answered back.  Berge kept openly filming.  Delisi then walked into superintendent Ben Lummis's office.

Standing at the door of his office, Lummis asked Berge to stop recording.  "You do not have permission to film in this

---

[2] Broadly speaking (because there is no all-inclusive definition), a citizen-journalist is like an unpaid freelancer who uses digital media to report on newsworthy events.  <u>See</u> William R. Montross, Jr. & Patrick Mulvaney, *Virtue and Vice: Who Will Report on the Failings of the American Criminal Justice System?*, 61 Stan. L. Rev. 1429, 1459-60 (2009).

area."  Berge kept openly filming.  "I'm happy to speak with you," Lummis added, "if you turn that off."   "You do not have my permission to film here right now," Lummis said as well.  Berge kept openly filming.  And Lummis closed his office door.

Assistant superintendent Gregg Bach then walked over to Berge.  And with Berge still openly filming, Bach took notes about Berge's bid to see his daughter's play.  Unlike the others, Bach voiced no objection to Berge's filming.

Hoping to "expose" the "unreasonableness" of the district's "policy," Berge uploaded the video (along with his commentary) to Facebook that very day.  And he made the material publicly viewable as well.

None too pleased, district-human-resources director Roberta Eason fired off a letter to Berge within hours.  Citing Mass. Gen. Laws ch. 272, § 99(C), she accused him of violating Massachusetts's wiretap act by not getting "the consent" of all participating officials before recording and posting the film. And she "demand[ed]" that he "immediately" remove the video or face "legal action" (his supposed wiretap act violation was the one and only reason she gave for the removal demand).[3]

---

[3] Because of its importance, we quote the letter's body in full:

This letter is in response to your Facebook posting of a recording taken by you today without the consent of all parties at the Gloucester Public Schools

Turns out she was way off base in relying on the wiretap act. And that is because this law pertinently bans "*secret*" recordings, which Berge's most certainly was not. See, e.g., Curtatone v. Barstool Sports, Inc., 169 N.E.3d 480, 483-84 (Mass. 2021) (emphasis added) (concluding that the plaintiff's wiretap act claim failed after noting that the defendant-interviewer "did not secretly hear or record the challenged communication" within act's "plain meaning" since "plaintiff knew throughout the call that his words were being heard and recorded").

### Federal Lawsuit

Berge did not do as directed, however. He instead sued the Gloucester school committee, plus Lummis, Eason, and Delisi in their individual capacities. His operative complaint alleges four counts (we simplify our description, but without affecting our analysis). Count 1 presses a claim of First Amendment retaliation

---

Administration Building. Please be advised that Massachusetts recording law stipulates that it is a two-party consent state. In Massachusetts, it is a criminal offense to use any device to record and/or disseminate communications, whether the communications are by wire, oral or electronic, without the consent of all contributing parties. Mass. Ann. Laws. ch. 272, § 99(C). This means that in Massachusetts you are prohibited from recording a conversation you are taking part in unless all parties are in agreement. Ms. Delisi unambiguously told you that she was not consenting to being recorded.

We demand that you immediately remove the post from your Facebook account and/or any other communications to prevent the pursuit of legal action in this matter.

under 42 U.S.C. § 1983 (which allows a plaintiff to sue persons who, acting under the color of state law, violated the plaintiff's federal constitutional or statutory rights. See Martin v. Somerset Cnty., 86 F.4th 938, 943 (1st Cir. 2023)).[4]  According to that count, defendants threatened "bogus legal" action under the state wiretap act to "frighten him into suppressing his own First Amendment rights."  Counts 2 through 4 seek declarations that Berge "had a First Amendment right to publish" his video and that he violated neither the state wiretap act nor the federal Family Educational Rights and Privacy Act ("FERPA," which relevantly bars schools from unilaterally disclosing sensitive education records, see 20 U.S.C. § 1232g(b)).[5]  Each declaratory count alleges that he "desires to continue to record and publish videos, with audio included, of his anticipated future communications with [d]efendants."  And each also alleges that by "falsely accus[ing]" him of breaking the law and making a mockery "of his First Amendment rights," defendants put him "in fear of prosecution" and

---

[4] To state such a claim, a plaintiff like Berge must plead that he engaged in First Amendment-protected conduct, that he suffered an adverse action, and that his protected conduct played a "substantial or motivating" part in the adverse action.  See, e.g., Gattineri v. Town of Lynnfield, 58 F.4th 512, 514 (1st Cir. 2023).

[5] Berge claims that defendants "accuse[d]" him of violating FERPA at some point during this period.

"directly harm[ed] . . . his reputation."  The complaint requests damages, declaratory and injunctive relief, and attorney fees.

Along with his complaint, Berge filed a motion for a temporary restraining order and preliminary injunction.[6] Spotlighting the Eason-signed letter, the motion asked the district judge to stop defendants "from threatening or attempting to coerce [him] into removing his First Amendment-protected speech."

Days later (after Berge had served the complaint), the school committee's lawyer phoned Berge's to say that the district had withdrawn the Eason-signed letter.  In a written follow-up, the school committee's attorney confirmed "that the [Eason-signed] letter . . . has been revoked and the [d]istrict will not take any criminal action against . . . Berge relating to the recording that took place inside the school administration building" in early March 2022.

Also around this same time, Berge's lawyer emailed the school committee's to say that "[w]e have accepted, for the sake of peace at this time, your position that there was no First Amendment right to record in that office" — adding that "[w]e do

---

[6] A temporary restraining order and (ultimately) a preliminary injunction preserve the status quo during the pendency of trial-court proceedings.  See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty., 415 U.S. 423, 439 (1974) (temporary restraining order); Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981) (preliminary injunction).

disagree, but had not sought your admission of this, nor do we bring that claim in the [operative] complaint[]."  The email then insisted that "Berge had a First Amendment right to *publish* the video."  So "[e]ven if" he "unlawfully made" the video, the email continued, "he would still have a First Amendment right to **publish** it" — "[t]he legal threat was that he would be prosecuted if he did not cease **publication** of the video."

Before answering the complaint, defendants asked the district judge to dismiss the suit for not stating a claim for which relief could be granted.  See Fed. R. Civ. P. 12(b)(6). Berge opposed the motion.  But the judge tossed the case. Pertinently for our purposes, she first granted the individual defendants qualified immunity on the retaliation count.  As she saw things, existing law did not clearly establish a First Amendment right to publish the video because Berge had not offered any "precedent even vaguely applicable to the facts" presented here.  She next labeled the declaratory counts moot because defendants had revoked the Eason-signed letter.  And she saw "little chance" that, after the case's "dismissal," they would "send a subsequent demand letter to reignite this controversy" — principally because they "have agreed to take no further action."

She also denied the motion for a temporary restraining order and preliminary injunction as moot.[7]

Berge timely appealed the complaint's dismissal and the motion's denial.

### OUR TAKE ON THE SITUATION

### Complaint's Dismissal

The judge (to repeat) dismissed Berge's First Amendment retaliation count against the individual defendants on qualified-immunity grounds, ruling that they had not robbed him of any clearly established right to publish the video — a decision driven by her belief that he had not cited precedent that even loosely applied to his facts. And she (to remind) dismissed the declaratory counts on mootness grounds, ruling that the retraction letter sent by the school committee's lawyer during the suit — confirming "that the [Eason-signed] letter . . . has been revoked and the [d]istrict will not take any criminal action against . . .

---

[7] A restless reader might wonder about Berge's First Amendment retaliation claim against the school committee. Such a municipal entity — which (unlike public officials) does *not* enjoy qualified immunity — may be liable under § 1983 when its policy or custom inflicts the constitutional injury. See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257-58 (2009); Haley v. City of Bos., 657 F.3d 39, 51 (1st Cir. 2011). The judge provided no analysis on that front, however. But because Berge does not complain about the omission, he waived any argument he might have. See, e.g., Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175-76 (1st Cir. 2011). On top of that, his reply brief concedes that "no" municipal policy or custom motivated the unlawful conduct — and that therefore the school committee cannot be sued under § 1983.

Berge relating to the recording that took place inside the school administration building" in March 2022 — created "little chance" that defendants would respark this dispute.

Berge attacks, and defendants defend, each ruling. But based on our *de novo* review — see Eves, 927 F.3d at 578 (qualified immunity); Me. State Bldg. & Constr. Trades Council, AFL-CIO v. U.S. Dep't of Lab., 359 F.3d 14, 17 (1st Cir. 2004) (mootness) — Berge prevails on the retaliation-count ruling but not on the declaratory-counts ruling.[8]

(a)
Retaliation Count

Rolling up our sleeves, we begin with primers on qualified-immunity and free-speech principles before ending with our analysis of the retaliation count's dismissal.

(i)
*Qualified-Immunity Primer*

Qualified immunity seeks to balance two opposing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The doctrine has its critics. See Zadeh v. Robinson, 902

---

[8] *De novo* review means review without deference to the district judge's views. See, e.g., Reyes-Colón v. United States, 974 F.3d 56, 60 (1st Cir. 2020).

F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring dubitante), modified on reh'g, 928 F.3d 457, 474, 479-81 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part) (collecting sources). But here it shields the individual defendants unless Berge pled facts — adopted as true — showing that (1) they violated a constitutional guarantee that (2) was not only established but "*clearly* established" when they acted. See District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (emphasis added); see also Pearson, 555 U.S. at 236 (recognizing that judges can consider the two steps in any order); Perry v. Spencer, 94 F.4th 136, 146 (1st Cir. 2024) (en banc).

A right is clearly established if it was "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (alteration in original) (quotation marks omitted). Berge can satisfy that requirement by citing controlling caselaw — or a consensus of persuasive caselaw — finding a violation in a factually *similar* situation that places his right "beyond debate" (the point is he need not cite binding caselaw involving *identical* facts). See Wesby, 583 U.S. at 63. But he can also satisfy that requirement by citing a "general" standard "already identified in the decisional law" that "appl[ies] with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held

unlawful" (a rule that prevents absurd results). See Hope v. Pelzer, 536 U.S. 730, 741 (2002) (second alteration in original) (quotation marks omitted); see also, e.g., Sause v. Bauer, 585 U.S. 957, 959-60 (2018) (per curiam); Taylor v. Riojas, 592 U.S. 7, 8-9 (2020) (per curiam).[9]

(ii)
*Free-Speech Primer*

The First Amendment (applicable to the states via the Fourteenth) protects the freedom of speech, a freedom that includes the right "to speak, write, print [and] distribute information or opinion." Schneider v. New Jersey, 308 U.S. 147, 161 (1939).[10]  It protects the "right to gather news 'from any source by means within the law,'" a privilege that extends to *non*-journalists too. Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir. 2011) (quoting Houchins v. KQED, Inc., 438 U.S. 1, 11 (1978)); see also id. (adding that

---

[9] Suits involving obviously unlawful acts do not land on our docket every day. See, e.g., Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 377-78 (2009).  So a plaintiff will have a harder time finding factually similar caselaw in that scenario than in one involving closer legal questions. See id.  And it would be more than a little strange "if the most obviously unconstitutional conduct should be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt." Browder v. City of Albuquerque, 787 F.3d 1076, 1082-83 (10th Cir. 2015) (Gorsuch, J., for the panel); see also Redding, 557 U.S. at 377-78.

[10] Unless of course the speech falls into one of the Amendment's few categorical limits, like obscenity or incitement to crime. See, e.g., United States v. Stevens, 559 U.S. 460, 468 (2010).

- 13 -

"[t]he filming of government officials engaged in their duties in a public place . . . fits comfortably within these principles"). And its protections apply to the "vast democratic forums of the Internet," Packingham v. North Carolina, 582 U.S. 98, 104 (2017) (quoting Reno v. ACLU, 521 U.S. 844, 868 (1997)), just as "they do to the bulletin boards or town halls of the corporeal world," Garnier v. O'Connor-Ratcliff, 41 F.4th 1158, 1185 (9th Cir. 2022), vacated on other grounds, 601 U.S. 202, 207-08 (2024).[11]

Listed "first for a reason," see 141 Cong. Rec. S18059-02, S18061 (daily ed. Dec. 6, 1995) (statement of Sen. Bumpers), the First Amendment gives all of us — as players in the democratic process — space to ask public officials questions and to publish information from them without the threat of legal liability, see Lane v. Franks, 573 U.S. 228, 235-36 (2014); N.Y. Times Co. v. Sullivan, 376 U.S. 254, 269-83 (1964). "[I]t is only through [this] free debate and free exchange of ideas that government remains responsive to the will of the people and peaceful change is effected." Terminiello v. City of Chicago, 337 U.S. 1, 4

---

[11] See also Brown v. Ent. Merchs. Ass'n, 564 U.S. 786, 790 (2011) (saying that "whatever the challenges of applying the Constitution to ever-advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears" (quoting Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 503 (1952))).

(1949).[12]    So in such discussions "lies the security of the
Republic, the very foundation of constitutional government." <u>De
Jonge</u> v. <u>Oregon</u>, 299 U.S. 353, 365 (1937).

"'[N]ot all speech is of equal First Amendment
importance,' however, and where matters of purely private
significance are at issue, First Amendment protections are often
less rigorous." <u>Snyder</u> v. <u>Phelps</u>, 562 U.S. 443, 452 (2011)
(cleaned up). But speech on a "matter[] of public concern" is at
the core of the First Amendment. <u>Id.</u> at 451-52 (quoting <u>Dun &
Bradstreet, Inc.</u> v. <u>Greenmoss Builders, Inc.</u>, 472 U.S. 749, 758-
59 (1985) (opinion of Powell, J.)). That is because it "is more
than self-expression; it is the essence of self-government." <u>Id.</u>
at 452 (quoting <u>Garrison</u>, 379 U.S. at 74-75). Which is why it

---

[12] <u>See also</u> <u>Branzburg</u> v. <u>Hayes</u>, 408 U.S. 665, 681 (1972)
(emphasizing that newsgathering and reporting get First Amendment
protection because without them "freedom of the press could be
eviscerated"); <u>First Nat'l Bank of Bos.</u> v. <u>Bellotti</u>, 435 U.S. 765,
783 (1978) (noting that "the First Amendment goes beyond protection
of the press and the self-expression of individuals to prohibit
government from limiting the stock of information from which
members of the public may draw"); <u>Garrison</u> v. <u>Louisiana</u>, 379 U.S.
64, 77 (1964) (recognizing that the First Amendment secures "the
paramount public interest in a free flow of information to the
people concerning public officials, their servants"); <u>Schneider</u>,
308 U.S. at 161 (stating that "the freedom of speech and that of
the press [are] fundamental personal rights and liberties" that
sit "at the foundation of free government" (footnote omitted));
<u>Whitney</u> v. <u>California</u>, 274 U.S. 357, 375 (1927) (Brandeis, J.,
concurring) (pointing out that the First Amendment's drafters
thought "that the greatest menace to freedom is an inert people;
that public discussion is a political duty; and that this should
be a fundamental principle" of our Nation).

deserves "special protection." Connick v. Myers, 461 U.S. 138, 145 (1983).

So it should not be a surprise that the First Amendment grants a robust right to publish information of public concern, see Smith v. Daily Mail Publ'g Co., 443 U.S. 97, 103 (1979) (affirming that "state officials may not constitutionally punish publication" of "lawfully obtain[ed] truthful information about a matter of public significance," "absent a need to further a state interest of the highest order") — even including material that someone else stole, certainly at least where the publisher had no hand in the theft.

Consider first New York Times Co. v. United States ("Pentagon Papers"), where the Supreme Court refused to enjoin the publication of purloined documents that two newspapers passively got from the purloiner. 403 U.S. 713, 714 (1971) (per curiam). Dealing with expression at the very heart of the First Amendment — classified material about the country's involvement in the Vietnam War — the Court concluded that the government had not met its "heavy burden" of showing that the harm from publication might be sufficiently likely, imminent, and grave to justify a "prior restraint[]" (a fancy term for censorship). See id. (quotation marks omitted).

Consider also Bartnicki v. Vopper, where the Court held that the First Amendment protected the publication of an illegally

recorded communication of public concern — a private chat about a dispute between a public union and a school district — obtained by the publisher lawfully but by a source illegally, even though the publisher knew or should have known about the source's law-breaking. 532 U.S. 514, 518, 524-25, 527-35 (2001). "[P]rivacy concerns g[a]ve way when balanced against the interest in publishing matters of public importance," the Court said (as it also left open whether the government can punish a publisher who "acquired" the at-issue material "*unlawfully*"). Id. at 528, 534 (emphasizing that "[o]ne of the costs associated with participation in public affairs is an attendant loss of privacy").

And consider now Jean v. Mass. State Police, where we (applying Bartnicki) held that the First Amendment protected an internet posting of public-concern material — a secretly-recorded police arrest and search of a private home. 492 F.3d 24, 25 (1st Cir. 2007). We ruled that way even though the poster had "reason to know" that the source had "illegally recorded" the events, and even though the poster had "arguably participated . . . in a conspiracy to disclose" the video but had "played no part" in the source's illegal recording. Id. at 25, 30-33.

What exactly is speech on a "matter of public concern" remains a little fuzzy. Snyder, 562 U.S. at 452. But speech that "can 'be fairly considered as relating to any matter of political, social, or other concern to the community'" or that "is a subject

of legitimate news interest" — *i.e.*, "a subject of general interest and of value and concern to the public" — definitely fits the bill. See id. at 453 (first quoting Connick, 461 U.S. at 146, and then quoting San Diego v. Roe, 543 U.S. 77, 83-84 (2004) (per curiam)).[13] And speech that deals with "matters of '*purely* private concern'" definitely does not.  See id. at 454 (emphasis added) (quoting Dun & Bradstreet, 472 U.S. at 759).[14]

First Amendment freedoms are not without limits, however (as we intimated in the explanatory parenthetical appended to our Daily Mail cite).  See id. at 456.  In some situations, for example, a person's "choice of where and when" to speak "is not beyond the [g]overnment's regulatory reach" — provided the "time, place, or manner restrictions" satisfy certain requirements (none relevant

---

[13] Snyder is a good example.  A religious group protested a soldier's private funeral with signs saying things like, "Thank God for IEDs," "Thank God for Dead Soldiers," and "Thank God for 9/11."  562 U.S. at 448.  The First Amendment protected the group's speech because it touched on "matters of public import," including "the political and moral conduct of the United States and its citizens."  Id. at 454.

[14] Dun & Bradstreet is a helpful example.  A credit agency sent a false report to five subscribers indicating that a contractor had filed for bankruptcy.  472 U.S. at 751-52.  The First Amendment did not protect the agency's speech because it occurred "*solely* in the individual interest of the speaker and its specific business audience," was "made available to only five subscribers" who "could not disseminate it further," and had no relation to a "debate on public issues."  Id. at 762 (emphasis added) (quoting Sullivan, 376 U.S. at 270).

here).  See id. (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

(iii)
*Analysis*[15]

Addressing step one of the qualified-immunity analysis, we — after taking Berge's allegations as true (though knowing that discovery or trial evidence may cast the case in a different light) — have a hard time picturing a more textbook First Amendment violation.

Berge very publicly recorded public officials performing public duties in the publicly accessible part of a public building — all to get information about the district's COVID-19 policies, in a form he could then share, with the goal (to quote again from the complaint) of "expos[ing] and comment[ing] on the unreasonableness" of those "polic[ies]." See Citizens United v. FEC, 558 U.S. 310, 339 (2010) (remarking that "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it").  And his speech (front and center in the complaint) about COVID-19 protocols — the kind that has sparked much political and social debate (and litigation too)

_____

[15]  Because the constitutional violation and clearly established questions "overlap," Lyons v. City of Xenia, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring), some redundancies in our analysis are inevitable.

— strikes us as sufficiently "a subject of legitimate news interest" to come within the sphere of public concern. See Najas Realty, LLC v. Seekonk Water Dist., 821 F.3d 134, 143 (1st Cir. 2016) (indicating that speech about public health is a topic of public concern).

If the First Amendment means anything in a situation like this, it is that public officials cannot — as they did here — threaten a person with legal action under an obviously inapt statute simply because he published speech they did not like. See Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (2019) (reminding that the First Amendment "'generally'" bans "'government officials from subjecting an individual to retaliatory actions' for engaging in protected speech" (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006))); Sullivan, 376 U.S. at 269-70 (warning that government officials cannot try to censor or suppress speech they dislike just because they dislike it); see also Gericke v. Begin, 753 F.3d 1, 6 (1st Cir. 2014) (stressing that "[r]etaliation is always reprehensible" and that "it is obviously improper for officers to invoke [legal processes] for retaliatory purposes"). "[T]o prevent the pursuit of legal action in this matter," the Eason-signed letter "demand[ed]" that Berge "immediately remove the [video] from [his] Facebook account and/or any other communications." Which shows the complaint plausibly alleges that the individual defendants knew the legal-action threat centered on

Berge's *right to publish*.  What is more — and as already explained
— the letter cited the state wiretap act as the *only basis* for the
removal demand (no one defends the threat on any other ground).
But — as also earlier noted — the wiretap act only bans "secret"
recordings (in which the persons recorded did not know they were
being recorded) and thus does *not* apply here.  See Curtatone, 169
N.E.3d at 484.  Which shows the complaint plausibly alleges that
the individual defendants *knew* such action was *baseless*.

   And none of the individual defendants' comebacks compels
a different conclusion.

   For starters, the individual defendants write that "*if*"
— as Berge seems to "insist[]" — a First Amendment right to record
"his visit" is a prerequisite to Berge's First Amendment "claim
for a right to publish," then the judge correctly dismissed the
retaliation count because Berge had no First Amendment right to
record (emphasis added).  In other words — at least according to
the individual defendants — "[w]ithout a viable" First Amendment
"right to record," Berge's Facebook posting "enjoys no First
Amendment protection."  But as Berge's appellate papers point out,
"this is a *right to publish* case" — without a distinct "*claim* over
[a] right to record."  And as Berge's counsel indicated at oral
argument, we need not — given the case's posture — decide whether
Berge had a First Amendment right to record.  So *even if* Berge had
no First Amendment right to record (and we express no opinion

either way), that would not mean — given the complaint's facts — that the individual defendants could then baselessly burden his First Amendment right to publish.

On the right-to-publish issue, the individual defendants contend that because Berge wanted tickets to his daughter's play, his "visit" focused on *his* concerns rather than the *public's* — meaning (the argument continues) his speech fell outside the scope of the First Amendment. But some topics can *both* affect a party's personal interests *and* concern public affairs, yet *still* — just like Berge's COVID-19-related speech — land on the *protected* side of the line. See Connick, 461 U.S. at 146-47 (underscoring that speech of public concern relates to "political, social, or other concern to the community," as opposed to "matters *only* of personal interest" (emphasis added)). From this we hold that Berge's speech involved a matter of public concern.

Shifting then from qualified immunity's step one (constitutional rights violation) to step two (clearly established law), we also think it follows naturally from the above cases that Berge has plausibly pled a violation of a clearly established right to publish on a topic of public interest when the violators acted (as a reminder, but using a different case quote, a right is "clearly established" when it is no longer among the "hazy" area of constitutional issues that might be "reasonably misapprehend[ed]." See Brosseau v. Haugen, 543 U.S. 194, 198

(2004) (per curiam)).  And by "acted" we mean (as the complaint
alleges) threatening Berge with an obviously groundless legal
action:  Surely no sensible official reading these long-on-the-
books opinions could believe that that act — assuming it represents
an adverse action — was not a burden on Berge's First Amendment
right to publish on a matter of public concern.  So given all this,
Berge's complaint plausibly alleges that the threat constituted
First Amendment retaliation in violation of his clearly
established right.

And the individual defendants' pushback does not go far.

Convinced that Berge "failed to meet his burden of
showing" a violation of "any clearly-established First Amendment
right to publish his recording," the individual defendants — sort
of echoing the district judge — fault him for not citing a case
showing that he could record and publish "non-law enforcement
personnel (such as school administrators) performing official
duties in a limited or non-public forum where reasonable,
viewpoint-neutral restrictions on speech are routinely permitted."
But a "directly" on-point case is "not require[d]." al-Kidd, 563
U.S. at 741.  We say that because the general constitutional rules
highlighted above — including (for example) that "the First
Amendment prohibits *government officials* from subjecting an
individual to retaliatory actions . . . for speaking out," see
Hartman, 547 U.S. at 256 (emphasis added) — are so clear that (even

without a pre-existing case involving the same facts, and still assuming the threatened legal action would constitute an adverse action) the unlawfulness of what occurred is apparent, see Morse v. Cloutier, 869 F.3d 16, 29 (1st Cir. 2017) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)).

In addition to repeating an already-rejected argument — that the complaint's facts put Berge's speech on the "purely personal" rather than "public concern" side of the constitutional divide (our rejection reasons appear four paragraphs above) — the individual defendants lean on Pitta v. Medeiros, 90 F.4th 11 (1st Cir. 2024). But Pitta did not involve alleged retaliation against the plaintiff's right to *publish* but instead supposed retaliation against his right to *record*. So that case has no bearing on our analysis.

All to say: We cannot now hold the individual defendants qualifiedly immune on the retaliation count and so vacate the judge's dismissal of count 1 against them.

(b)
Declaratory Counts

We can make quicker work of the parties' fight over the dismissal of the declaratory counts on mootness grounds. An initial point of clarification, though. Berge's briefs claim that the retraction letter — affirming "that the [Eason-signed] letter . . . has been revoked and the [d]istrict will not take any criminal

action against . . . Berge relating to the recording that took place inside the school administration building" in March 2022 — did *not* cover *all* defendants and did *not* preclude their pursuing *civil* remedies. But responding to our questions at oral argument, defendants' counsel represented that *no* defendant reserves *any* right to take *any* action against him because of the March 2022 events. And we go on with that understanding.

Now and then real-world events "overtake" courtroom events in a way that lets the "complaining party" get "outside of litigation all the relief he might have won in it." FBI v. Fikre, 144 S. Ct. 771, 777 (2024). When that occurs, we judges "must dismiss the case [or part of the case] as moot" — "*must* dismiss" because a moot dispute is not a live dispute, which makes a federal court's jurisdiction evaporate. Id. (emphasis added); see also Already, LLC v. Nike, Inc., 568 U.S. 85, 90-91 (2013) (stressing that a dispute must stay live during all stages of litigation, not just when the complaint gets filed). Exactly so here, defendants argue, because (in their mind) the retraction letter and oral-argument representations voluntarily give Berge all the relief sought in his declaratory counts — thus justifying the counts' dismissal. Berge counters by invoking the "voluntary cessation" doctrine, a "stringent" exception to mootness. See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189 (2000). Taking a *de novo* view of the matter, see Bos. Bit Labs,

Inc. v. Baker, 11 F.4th 3, 8 (1st Cir. 2021), we this time side with defendants.

A defendant's voluntarily ending an unconstitutional practice may not moot a case if the plaintiff's alleged injury may happen again. See, e.g., Friends of the Earth, 528 U.S. at 190 (proclaiming that a defendant invoking the voluntary-cessation doctrine "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur"). But given defendants' withdrawal letter *and* open-court representations, we think they have made it absolutely clear that they will not repeat the challenged behavior. That Berge intends to continue making and publishing recordings of "his anticipated future communications with [d]efendants" (a quote lifted from his declaratory counts) does not change the result either. Given today's holding that his complaint (considered in the right light) paints a picture of unconstitutional retaliation, we see no reason to suspect that defendants will ignore binding precedent and repeat the alleged wrong. See generally Resurrection Sch. v. Hertel, 35 F.4th 524, 529 (6th Cir. 2022) (en banc) (finding the "prospect" that officials would return to their old ways "exceedingly remote" partly because of binding precedent published after the controversy originally erupted). And his other ideas — like his saying that defendants' "representation[s]" do not "bind them to

not cooperate with any action" a prosecutor "might take" — are too speculative to revive these otherwise-moot counts.  See Calvary Chapel of Bangor v. Mills, 52 F.4th 40, 50 (1st Cir. 2022).

Bottom line:  We must hold the declaratory counts moot and so affirm the judge's dismissal of those counts.

### Motion's Denial

Even less need be said about the judge's decision stamping "moot" Berge's motion for a temporary restraining order and preliminary injunction.  Berge himself notes that his motion sought to "bar[]" defendants "from threatening or coercing him into removing his video."  But he got all that with the withdrawal letter *plus* the oral-argument representations, which — based on our *de novo* review, see Bos. Bit Labs, 11 F.4th at 8 — moot his request, see Alvarez v. Smith, 558 U.S. 87, 92-94 (2009).

Net result:  We must deem the motion for a temporary restraining order and preliminary injunction moot and so affirm the judge's denial of that motion.

### WHAT THIS ALL MEANS

We *vacate* the judgment dismissing the retaliation count against the individual defendants and remand with directions to reinstate that count against them.  But we *affirm* the dismissal of the retaliation count against the school committee.  We also *affirm* the judgment dismissing the declaratory counts.  And we *affirm* as

well the denial of the motion for a temporary restraining order and preliminary injunction.[16]

   ***Vacated in part, affirmed in part, and remanded for further proceedings.  Berge shall recover his costs on appeal.***

---

[16] We also thank the *amici* and their counsel for their helpful briefs.