NO. 22-1954

In The

# United States Court of Appeals
### For The First Circuit

**INGE BERGE,**

*Plaintiff-Appellant,*

*v.*

**SCHOOL COMMITTEE OF GLOUCESTER, BEN LUMMIS, in his personal capacity; ROBERTA A. EASON, in her personal capacity; and STEPHANIE DELISI, in her personal capacity,**

*Defendants-Appellee.*

*On Appeal from the United States District Court for the District of Massachusetts,
No. 1:22-CV-10346, Honorable Angel Kelley, Presiding*

_____

## BRIEF OF AMICI CURIAE INSTITUTE FOR JUSTICE AND THE FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

_____

Ronald London, No. 1183316
FOUNDATION FOR INDIVIDUAL
RIGHTS AND EXPRESSION
700 Pennsylvania Ave. SE
Suite 340
Washington, DC 20003
(215) 717-3473
ronnie.london@thefire.org

March 2, 2023

Anna J. Goodman, No. 1207113
*Lead Counsel*
Jaba Tsitsuashvili, No. 1207112
Patrick Jaicomo, No. 1207114
Anna Bidwell, No. 1207115
INSTITUTE FOR JUSTICE
901 North Glebe Road
Suite 900
Arlington, VA 22203
(703) 682-9320
agoodman@ij.org

*Counsel for Amici Curiae*

i

## CORPORATE DISCLOSURE STATEMENT

Undersigned counsel certifies, pursuant to Federal Rule of Appellate Procedure 26.1(a), that amicus curiae Institute for Justice is not a publicly held corporation and does not have any parent corporation, and that no publicly held corporation owns 10 percent or more of any corporation's stock.

Undersigned counsel further certifies, pursuant to Federal Rule of Appellate Procedure 26.1(a), that amicus curiae Foundation for Individual Rights and Expression is not a publicly held corporation and does not have any parent corporation, and that no publicly held corporation owns 10 percent or more of any corporation's stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iv

INTEREST OF AMICI ................................................................... 1

SUMMARY OF ARGUMENT ................................................... 3

ARGUMENT ............................................................................ 7

I.      Qualified immunity does not shield officials from liability when they retaliate for the exercise of First Amendment rights. ............ 7

    A.      The clearly-established test is about fair warning, not identical circumstances .......................................................... 8

    B.      It is axiomatic that the First Amendment prohibits legal consequences for exercising the right to free speech ........... 13

    C.      Qualified immunity does not provide protection outside the split-second context .......................................................... 20

    D.      Using a statute in an obviously unconstitutional manner is obviously unconstitutional. ............................................... 24

II.     Judges and scholars nationwide are decrying the type of approach to qualified immunity taken by the district court as an evisceration of Section 1983. .................................................... 26

III.    To avoid further erosion of Section 1983, this Court should clearly establish the law going forward, even if it grants immunity here (which it should not). ........................................... 29

CONCLUSION ..................................................................... 32

CERTIFICATE OF SERVICE ................................................. 33

CERTIFICATE OF COMPLIANCE ....................................... 34

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011)................................................................ 16, 21, 23

*Atwater v. Lago Vista,*
    532 U.S. 318 (2001)........................................................................22

*Branzenburg v. Hayes,*
    408 U.S. 665 (1972)...................................................................17–18

*Brosseau v. Haugen,*
    543 U.S. 194 (2004)........................................................................ 10

*Burnett v. Grattan,*
    468 U.S. 42 (1984).......................................................................... 20

*Camreta v. Greene,*
    563 U.S. 692 (2011)...................................................................29–31

*Carey v. Nev. Gaming Control Bd.,*
    279 F.3d 873 (9th Cir. 2002)...........................................................25

*City of Escondido v. Emmons,*
    139 S. Ct. 500 (2019)...................................................................... 12

*Cohen v. Cowles Media Co.,*
    501 U.S. 663 (1991)........................................................................ 19

*Connick v. Myers,*
    461 U.S. 138 (1983)........................................................................ 15

*Cooper v. Dillon,*
    403 F.3d 1208  (11th Cir. 2005).......................................................25

*Crawford-El v. Britton,*
    523 U.S. 574 (1998)...................................................................23, 26

*Decotiis v. Whittemore,*
    635 F.3d 22 (1st Cir. 2011) ............................................................. 11

iv

*Dep't of Commerce v. New York,*
   139 S. Ct. 255 (2019) ........................................................................... 8

*Elliot-Park v. Manglona,*
   592 F.3d 1003 (9th Cir. 2010) ........................................................ 10

*Estate of Smart v. City of Wichita,*
   2018 WL 3744063 (D. Kan. Aug. 7, 2018) ..................................... 27

*Eves v. LePage,*
   927 F.3d 575 (1st Cir. 2019) .......................................................... 30

*FCC v. League of Women Voters of Cal.,*
   468 U.S. 364 (1984) ......................................................................... 15

*FEC v. Wis. Right to Life, Inc.,*
   551 U.S. 449 (2007) ......................................................................... 16

*Felder v. Casey,*
   487 U.S. 131 (1988) ......................................................................... 20

*First Nat'l Bank of Bos. v. Bellotti,*
   435 U.S. 765 (1978) ......................................................................... 17

*Fla. Star v. B.J.F.,*
   491 U.S. 524 (1989) ......................................................................... 17

*Franchini v. Investor's Business Daily, Inc.,*
   981 F.3d 1 (1st Cir. 2020) .............................................................. 15

*Gericke v. Begin,*
   753 F.3d 1 (1st Cir. 2014) ...................................... 7, 15–16, 18–19

*Glik v. Cunniffe,*
   655 F.3d 78 (1st Cir. 2011) ............................................................ 18

*Globe Newspaper Co. v. Superior Ct.,*
   457 U.S. 596 (1982) ......................................................................... 15

*Grossman v. City of Portland,*
   33 F.3d 1200 (9th Cir. 1994) .......................................................... 25

*Guillemard-Ginorio v. Contreras-Gómez,*
    490 F.3d 31 (1st Cir. 2007) ................................................................ 25

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ...................................................................... 8, 22

*Hartman v. Moore,*
    547 U.S. 250 (2006) .......................................................................... 12

*Hoggard v. Rhodes,*
    594 U.S. __, 141 S. Ct. 2421 (2021) ................................................ 23

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ........................................ 7, 9–11, 17, 23

*Horvath v. City of Leander,*
    946 F.3d 787 (5th Cir. 2020) ...................................................... 16, 27

*Houchins v. KQED, Inc.,*
    438 U.S. 1 (1978) .............................................................................. 17

*Irizarry v. Yehia,*
    38 F.4th 1282 (10th Cir. 2022) ........................................................ 15

*Jennings v. Jones,*
    499 F.3d 2 (1st Cir. 2007) ................................................................ 12

*King World Prods., Inc.,*
    898 F.2d 56 (6th Cir. 1990) .............................................................. 15

*Kisela v. Hughes,*
    138 S. Ct. 1148 (2018) ............................................................ 12, 26–27

*Lawrence v. Reed,*
    406 F.3d 1224 (10th Cir. 2005) ........................................................ 25

*Lederman v. United States,*
    291 F.3d 36 (D.C. Cir. 2002) ............................................................ 25

*Leonard v. Robinson,*
    477 F.3d 347 (6th Cir. 2007) ............................................................ 25

*Lovell v. City of Griffin,*
  303 U.S. 444 (1938)....................................................................15

*Manzanares v. Roosevelt Cnty. Adult Detention Ctr.,*
  331 F. Supp. 3d 1260 (D.N.M. 2018) ....................................27

*McCoy v. Alamu,*
  141 S. Ct. 1364 (2021).............................................................10

*McCoy v. Alamu,*
  950 F.3d 226 (5th Cir. 2020)...................................................10

*McKinney v. City of Middletown,*
  49 F.4th 730 (2d Cir. 2022)............................................26, 28

*Michigan v. DeFillippo,*
  443 U.S. 31 (1979)...........................................................24–25

*Mills v. Alabama,*
  384 U.S. 214 (1966).................................................................13

*Mitchell v. Forsyth,*
  472 U.S. 511 (1985).................................................................22

*Moderwell v. Cuyahoga County,*
  997 F.3d 653 (6th Cir. 2021).....................................................9

*NAACP v. Button,*
  371 U.S. 415 (1963).................................................................16

*Nelson v. Corr. Med. Servs.,*
  583 F.3d 522 (8th Cir. 2009).....................................................9

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964).........................................................14, 18

*Pearson v. Callahan,*
  555 U.S. 223 (2009).................................................................31

*Phelps-Roper v. Koster,*
  713 F.3d 942 (8th Cir. 2013)...................................................15

vii

*Ryburn v. Huff,*
    565 U.S. 469 (2012)................................................................22

*Sabir v. Williams,*
    52 F.4th 51 (2d Cir. 2022)....................................................30

*Santosky v. Kramer,*
    455 U.S. 745 (1982)..................................................................9

*Sause v. Bauer,*
    138 S. Ct. 2561 (2018)..........................................................13

*Seals v. McBee,*
    898 F.3d 587 (5th Cir. 2018)................................................19

*Smith v. Daily Mail Publ'g Co.,*
    443 U.S. 97 (1979)................................................................17

*Taylor v. Riojas,*
    141 S. Ct. 52 (2020)..............................................................10

*Thompson v. Clark,*
    2018 WL 3128975 (E.D.N.Y. June 26, 2018)......................27

*Thompson v. Ragland,*
    23 F.4th 1252 (10th Cir. 2022) ...........................................19

*Turner v. Driver,*
    848 F.3d 678 (5th Cir. 2017)................................................17

*United States v. Rodgers,*
    461 U.S. 677 (1983)..................................................................9

*Ventura v. Rutledge,*
    398 F. Supp. 3d 682 (E.D. Cal. 2019) .................................27

*Vinyard v. Wilson,*
    311 F.3d 1340 (11th Cir. 2002)............................................10

*Virginia v. Black,*
    538 U.S. 343 (2003)..............................................................15

*Vives v. City of New York*,
   405 F.3d 115 (2d Cir. 2005) .............................................................. 25

*Wyatt v. Cole*,
   504 U.S. 158 (1992) ........................................................................... 26

*Zadeh v. Robinson*,
   928 F.3d 457 (5th Cir. 2019) ................................................. 14, 26, 28

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) ................................................................ 26, 28

## Constitutional Provisions

42 U.S.C. § 1983 ............................................... 2, 6, 20–21, 26–27, 29–31

U.S. Const. amend. I ...................................... , 2–7, 9, 11, 12–17, 29, 31

U.S. Const. amend. IV .............................................................. 11–13, 27

## Statutes

Mass. Gen. Laws ch. 272 § 99(B)(4) ...................................... 4, 20, 24, 26

## Other Authorities

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111
   Calif. L. Rev. 101 (forthcoming), *available at*
   https://tinyurl.com/QIFlawed-Fnd................................................ 21, 27

Evan Bernick, *It's Time to Limit Qualified Immunity*, Geo. J.L. &
   Pub. Pol'y: Legal Blog (Sept. 17, 2018),
   https://www.law.georgetown.edu/public-policy-journal/blog/its-
   time-tolimit-qualified-immunity/ ....................................................... 21

Jay R. Schweikert, Cato Institute, *Qualified Immunity:*
   *A Legal, Practical, and Moral Failure* (2020) ..................................... 31

Joanna C. Schwartz, *Police Indemnification*,
   89 N.Y.U. L. Rev. (2014) ................................................................... 27

Joanna C. Schwartz, *The Case Against Qualified Immunity*,
93 Notre Dame L. Rev. (2018) ............................................................. 27

William Baude, *Is Qualified Immunity Unlawful?*,
106 Calif. L. Rev. (2018) ................................................................... 27

x

## INTEREST OF AMICI[1]

1. The Institute for Justice ("IJ") is a nonprofit, public-interest law firm dedicated to defending the nation's constitutional structure and the foundations of a free society. IJ believes it is critical for courts to enforce constitutional limits on government power and ensure that the public can hold officials accountable when they violate the Constitution.

Because qualified immunity limits access to federal court and drastically hinders the enforcement of constitutional rights, IJ litigates and files amicus briefs in government immunity and accountability cases nationwide. *E.g., Cerisier v. City of New York, et al.*, 22-1756 (2d Cir.); *Villarreal v. City of Laredo, et al.*, 20-40359 (5th Cir.); *Pollreis v. Marzolf, et al.*, 21-3267 (8th Cir.); *Rosales v. Bradshaw, et al.*, 22-2027 (10th Cir.); *Ashaheed v. Currington*, 20-1237 (10th Cir.).

2. The Foundation for Individual Rights and Expression (FIRE) is a nonpartisan, nonprofit organization dedicated to defending the individual rights of all Americans to free speech and free thought—the

---

[1] Pursuant to Fed. R. App. P. 29(a), counsel for amici states: all parties consent to the filing of this brief; no party, party's counsel, or person other than amici authored this brief in whole or in part or contributed money intended to fund preparing or submitting this brief.

essential qualities of liberty. Since 1999, FIRE has successfully defended these rights through public advocacy, strategic litigation, and participation as amicus curiae in cases that implicate expressive rights under the First Amendment. *See, e.g.*, *Novak v. City of Parma, Ohio*, 22-293 (S. Ct.), *Doe v. Hopkinton Public Schools*, 20-1950 (1st Cir.). FIRE currently represents various plaintiffs in lawsuits seeking damages for First Amendment violations under 42 U.S.C. § 1983. Because of its decades of experience defending freedom of expression, FIRE is keenly aware of the need for a legal remedy when government officials violate First Amendment rights on- and off-campus.

IJ and FIRE thus have an interest in this Court's review and reversal of the district court's judgment below, which erroneously granted qualified immunity to the defendants based on irrelevant considerations and superficial fact distinctions, despite the well-established—and obvious—principle that First Amendment retaliation of any stripe is a constitutional violation.

## SUMMARY OF ARGUMENT

This case asks whether qualified immunity shields officials from suit under the First Amendment when they threaten legal action pursuant to a facially inapplicable statute in retaliation for the plaintiff's recording and publishing of a public conversation with a public official. The answer is no.

Plaintiff-Appellant Berge recorded a video of his visit to the office of the Superintendent of Gloucester Public Schools. The building was open to the public. He told the Superintendent's Executive Secretary he was recording for a story, and the Superintendent and Assistant Superintendent saw him recording while they spoke. And after his visit to the Superintendent's office, Mr. Berge did what people do these days: he took the footage, added commentary, and posted it to his public Facebook page. Hours later, he received a letter from the Human Resources Director of Gloucester Public Schools, wrongly asserting that recording and uploading the video to Facebook violated the Massachusetts Wiretapping Statute. The letter demanded he "immediately remove the post from [his] Facebook account and/or any other communications to prevent the pursuit of legal action in this

3

matter." AA19. But the letter itself shows that the defendants were attempting to misuse the law to silence Mr. Berge. The Massachusetts Wiretapping Statute, on its face, did not apply to the situation: it says clearly that it applies only to "secretly record[ing]." Mass. Gen. Laws ch. 272 § 99(B)(4). The letter makes clear that the school official Mr. Berge recorded in a public building knew she was being recorded. AA19.

In other words, the school district threatened Berge with legal action under an inapplicable statute because he engaged in the most quintessential of First Amendment-protected acts: publishing commentary about government officials. In such an instance, officials cannot hide behind the shield of qualified immunity.

Qualified immunity does not protect officials from liability for retaliating in response to the exercise of First Amendment rights. When a constitutional violation is obvious on its face, the Court need not look for factually similar caselaw to deny immunity. And when caselaw is considered, clear constitutional principles can be sufficient to provide notice of unconstitutionality, even absent factually identical caselaw. The district court erred by failing to adequately conduct this analysis, looking only to whether there were factually identical cases available.

4

The text, purpose, and caselaw surrounding First Amendment retaliation leave no question that the amendment prohibits subjecting individuals to legal consequences for their speech. The purpose of the First Amendment is to protect the right of Americans to speak freely, even—and especially—when officials dislike their speech. Free speech must be given the requisite breathing room to survive. If the First Amendment means anything, then, it surely means that a person can post a video taken in a public place with a public official's knowledge and provide commentary on it. And, conversely, it must also mean that any action taken to punish such speech is an obvious constitutional violation.

While similar caselaw is not required to show the clearly established nature of the violation of Mr. Berge's rights, the decisions of the Supreme Court and this Court—along with its sister circuits—*do* establish the unconstitutionality of retaliation, including in context of criminal prosecution or the threat of it. Particularly in the First Amendment context—and in a context which involves no element of "split-second" decision-making—this is sufficient to provide fair warning. Nor should officials be able to immunize themselves by citing a facially

inapplicable statute to justify their retaliation for and suppression of speech. Accordingly, this Court should reverse.

And in reversing, this Court should reaffirm qualified immunity's proper scope, making clear that its fair warning standard is not an invitation to grant impunity to government officials. A growing chorus of Justices, judges, and scholars are rightly concerned that the doctrine has unjustifiably come to eviscerate Section 1983's broad remedial text, history, and purpose.

Finally, even if the Court grants immunity here (which it should not), it should clearly establish the unconstitutionality of threatening legal action against an individual for exercising their First Amendment right to publish. Clearly establishing the law is imperative where, as here, the question is most likely to arise (and recur) in Section 1983 litigation; doing so avoids a cycle of immunity that frustrates the development of constitutional precedent, disincentivizes law-abiding behavior by government officials, and undermines the public's vindication of rights.

## ARGUMENT

### I. Qualified immunity does not shield officials from liability when they retaliate for the exercise of First Amendment rights.

Qualified immunity was never intended to be an ironclad shield, only penetrable when a constitutional violation mirrors one that came before it in the caselaw. The test for whether a law is sufficiently "clearly established" to provide notice to defendant officials that their actions are unconstitutional is an inquiry into fair warning, not identical precedent. *Hope v. Pelzer*, 536 U.S. 730, 739–43 (2002). And it is a fundamental principle that punishing people for exercising their First Amendment rights violates those rights. Nor did this case involve the type of close call or split-second considerations courts have sometimes used to justify the application of qualified immunity.

This Court should therefore reverse, reaffirming that qualified immunity does not protect officials who violate First Amendment rights simply because they do so under circumstances not identical to those that courts previously encountered. It is "obviously improper for officers to invoke criminal laws for retaliatory purposes" *Gericke v. Begin*, 753 F.3d 1, 6–7 (1st Cir. 2014) (denying qualified immunity for retaliatory

prosecution for illegal wiretapping). The unconstitutionality of defendants' conduct is sufficiently obvious that no case saying so should be necessary. Moreover, the existing caselaw provides adequate notice that retaliation is unconstitutional—and that legal action (or the threat thereof) is such retaliation. Defendants could not have reasonably believed a statute directed at "secret" recording had any applicability to Mr. Berge's very public recording of his visit to the Superintendent's office—their only purpose in threatening him with it was to silence him. The Court should make clear that such behavior will not be immunized.

## A. The clearly-established test is about fair warning, not identical circumstances.

In assessing government conduct, judges do not "exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (citation omitted). For all its flaws, *see infra* Part II, qualified immunity was never intended to be a "license to lawless conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). "Where an official could be expected to know that certain conduct would violate . . . constitutional rights, he should be made to hesitate." *Id.* Every reasonable government official knows that retaliating for speech they

dislike violates the First Amendment, regardless of the form that retaliation happens to take. This Court should not close its eyes to that obvious truth, as the district court did by asking only whether the facts of past cases mirrored this one's.

1. The Supreme Court has made clear the "salient question" determining whether qualified immunity applies is whether the officials had fair warning that their behavior violated the Constitution, not whether the "very action in question ha[d] previously been held unlawful." *Hope*, 536 U.S. at 739–42.

It is undisputed that some propositions are too obvious to require citation. *See, e.g.*, *United States v. Rodgers*, 461 U.S. 677, 694 (1983); *Santosky v. Kramer*, 455 U.S. 745, 789 (1982) (Rehnquist, J., dissenting). And sister circuits have repeatedly recognized that some constitutional violations are so self-apparent that no case is necessary to create notice of their unconstitutionality.[2]

---

[2] *See, e.g.*, *Moderwell v. Cuyahoga County,* 997 F.3d 653, 660 (6th Cir. 2021) (noting "obvious case" not entitled to qualified immunity "where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances"); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 534 (8th Cir. 2009) ("[t]he obvious cruelty inherent to" shackling an inmate in the final states of labor "should have provided [defendant] with some notice that [her] alleged conduct

Moreover, the Supreme Court recognized in *Hope*—and recently reaffirmed in *Taylor v. Riojas* and *McCoy v. Alamu*—"a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question," even in the absence of a factually comparable case. *Hope*, 536 U.S. at 741 (citations omitted); *see id.* at 745–46 (no qualified immunity where defendants tied plaintiff to painful "hitching post" as punishment); *Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (no qualified immunity where defendants put plaintiff in "deplorably unsanitary conditions for . . . extended period"); *McCoy v. Alamu*, 141 S. Ct. 1364 (2021) (no qualified immunity where defendant pepper-sprayed plaintiff "for no reason," *see* 950 F.3d 226, 235–37 (5th Cir. 2020) (Costa, J., dissenting in part)). As this Court has summarized it:

---

violated [plaintiff's] constitutional protection against cruel and unusual punishment" (citation omitted)); *Elliot-Park v. Manglona*, 592 F.3d 1003, 1008–09 (9th Cir. 2010) (no on-point case needed because non-discrimination principle in equal protection cases is "so clear"); *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) ("the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*"); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) ("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law").

> For a constitutional right to be clearly established there does not need to be a prior case with factually identical circumstances finding such a right. Rather, "notable factual differences may exist between prior cases and the circumstances at hand as long as the state of the law at the time gave the defendant 'fair warning' that his action or inaction was unconstitutional."

*Decotiis v. Whittemore*, 635 F.3d 22, 37 (1st Cir. 2011) (citations omitted).

In short, courts cannot, as the district court did here, limit their consideration to whether the plaintiff has identified cases with the same facts. Rather, the court must conduct a careful, principled analysis of whether the very nature of the official's violation or the established principles articulated in caselaw would put a reasonable official on notice of the unconstitutional nature of his actions. Any analysis that fails to fully account for these principles risks "the danger of a rigid, overreliance on factual similarity." *Hope*, 536 U.S. at 742.

2. Additionally, in conducting its analysis, this Court should take the opportunity to clarify the distinction between qualified immunity precedent governing some *Fourth* Amendment violations and the precedent governing *First* Amendment violations. The Supreme Court has justified its application of the doctrine in some Fourth Amendment

cases on the notion that such cases sometimes require a factbound assessment of "reasonableness" in fast-moving, dangerous circumstances. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (discussing factors to be considered in assessing the reasonableness of an officer's actions); *see also City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (noting that the factual focus of the Fourth Amendment analysis is what makes specificity "especially important"). As discussed above, fair warning does not require factually identical precedent even in the Fourth Amendment context. *E.g., Jennings v. Jones*, 499 F.3d 2, 16–17 (1st Cir. 2007). But such rigidity would be particularly inappropriate in the First Amendment context.

First Amendment retaliation is governed by a brightline rule: if a government defendant takes an adverse action against the plaintiff because the plaintiff exercised his right to free speech, the government defendant retaliated against him and therefore violated the Constitution. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out" (collecting cases)). The court should take this opportunity to recognize

this contextual distinction and make clear that the "the absence of a prior case involving the unusual situation alleged to have occurred" does not justify qualified immunity in the First Amendment context.[3] *Sause v. Bauer*, 138 S. Ct. 2561, 2562 (2018) (reversing qualified immunity based on established First Amendment right to pray, despite absence of factually analogous case).

### B. It is axiomatic that the First Amendment prohibits legal consequences for exercising the right to free speech.

"[T]here is practically universal agreement that a major purpose of that [First] Amendment [i]s to protect the free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). Granting immunity to local officials just because they retaliated in novel circumstances cannot be harmonized with that fundamental tenet; indeed, it would actively erode it. It would perversely tell government officials they can "duck consequences for bad behavior—no matter how palpably unreasonable—as long as they were the *first* to behave badly"

---

[3] The Court can leave for another day the proper scope of the analysis in the Fourth Amendment context.

in a particular way or under a particular statute. *Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., concurring in part).

1. For reasonable officials to conclude that retaliation violates the First Amendment, even passing familiarity with the phrase "abridging the freedom of speech, or of the press" (*see* Amendment I) and our national culture should suffice. As the Supreme Court discussed in *New York Times Co. v. Sullivan*, the First Amendment is a "constitutional safeguard . . . fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." 376 U.S. 254, 269 (1964) (cleaned up). "It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *Id.* (cleaned up). This leads to the type of "uninhibited, robust, and wide-open" debate on public issues long valued in the United States as central to the success and longevity of our nation. *Id.* at 270.

The important role the First Amendment plays in protecting debate and diverse opinions has been repeatedly echoed in subsequent

jurisprudence from the Supreme Court[4]—as well as this Court[5] and its

sister circuits.[6] The widely varied factual circumstances in which these

pronouncements are reiterated over and over—and the vehemence with

which the judiciary refuses to condone government efforts to suppress

speech—make obvious to every government official (except those "plainly

---

[4] *See, e.g.*, *Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting"); *Connick v. Myers*, 461 U.S. 138, 145 (1983) ("The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"); *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 604 (1982) (recognizing the "common understanding that 'a major purpose of [the First Amendment] was to protect the free discussion of governmental affairs'"); *Lovell v. City of Griffin*, 303 U.S. 444, 451–52 (1938) ("While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the [First Amendment]").

[5] *See, e.g.*, *Franchini v. Investor's Business Daily, Inc.*, 981 F.3d 1, 8 (1st Cir. 2020) ("Under the 'cognate' free speech right, the Supreme Court has recognized that 'editorial opinion on matters of public importance . . . is entitled to the most exacting degree of First Amendment protection." (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 375–76 (1984)); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014) ("gathering information about government officials in a form that can be readily disseminated 'serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs'").

[6] *See, e.g.*, *Phelps-Roper v. Koster*, 713 F.3d 942, 947–48 (8th Cir. 2013) (holding even "repugnant" speech entitled to constitutional protection); *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022) ("There is practically universal agreement that a major purpose of' the First Amendment 'was to protect the free discussion of governmental affairs." (cleaned up)); *In re King World Prods., Inc.*, 898 F.2d 56, 59 (6th Cir. 1990) ("Protection of the right to information that appeals to the public at large and which is disseminated by the media is the cornerstone of the free press clause of the first amendment").

incompetent or . . . knowingly violat[ing]" the Constitution) that retaliation for speech is not a gray area in the law. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted).

This is also consistent with the constitutional principle that "First Amendment freedoms need breathing space to survive." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 468–69 (2007) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). If qualified immunity were to protect officials who punish or threaten people for exercising their First Amendment rights, then the judge-made doctrine would trample on that breathing space and result in precisely the sort of chilling effect the Amendment was enacted to guard against. Indeed, it would turn the First Amendment on its head; "we are concerned about government chilling the citizen—not the other way around." *Horvath v. City of Leander*, 946 F.3d 787, 802 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part).

Accordingly, it is "obviously improper for officers to invoke criminal laws for retaliatory purposes." *Gericke*, 753 F.3d at 6. If the First Amendment means anything, it surely means that a person has the right to post a video taken in a public place with a public official's knowledge

16

(and accompany it with his own commentary) without threat of prosecution. This should be the end of the inquiry. No similar caselaw is required to give a reasonable official notice of the obvious proposition that threatening legal action and suppressing speech under a facially inapplicable statute is a First Amendment violation.

2. While no such caselaw should be necessary, there are also "general constitutional rule[s] already identified in the decisional law" that do provide fair warning that the defendants' conduct was a constitutional violation. *Hope*, 536 U.S. at 741 (citation omitted). First, "[t]here is 'an undoubted right to gather news from any source by means within the law.'" *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978)). Decades of jurisprudence make it too obvious to "require belaboring," *Riley v. City of Chester*, 612 F.2d 708, 714 (3d Cir. 1979), that asking questions to solicit, receive, and even publish nonpublic information is a means of newsgathering within the law, because it is protected by the First Amendment. *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 99, 103 (1979); *Fla. Star v. B.J.F.,* 491 U.S. 524, 534 (1989); *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978); *Branzenburg v. Hayes*, 408 U.S. 665,

17

681–82 (1972). Equally well-established is a journalist's general right to publish what he has legally obtained. *See generally N.Y. Times*, 376 U.S. at 268–69.

And this circuit has been clear that such generally applicable rules preclude officials from dodging liability by hiding behind qualified immunity. For example, in *Gericke*, this Court affirmed the district court's conclusion that its earlier decision in *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) clearly established the broad rule that "a reasonable officer should have known that a blanket prohibition on recording *all* traffic stops, no matter the circumstances, was not constitutionally permissible." *Gericke*, 753 F.3d at 6–7. Accordingly, while the facts in *Gericke* were different from those in *Glik*, this Court held that—absent evidence of some "reasonable restriction" on the right to film (which plaintiff asserted did not exist)—the factual differences did not matter, and the established rule warranted denial of immunity.[7] *Id.* So too here: though the defendants' retaliation may not have a factually identical corollary case, it is an established rule that defendants may not take legal

---

[7] As noted above, *Gericke* involved retaliatory prosecution for illegal wiretapping.

action against an individual for publishing and commentating on the news, and this available caselaw gives defendants the requisite warning.

It is true that under qualified immunity's fair warning standard, some claims arising from newsgathering or publishing-related actions might be nuanced or go the government's way—*e.g.*, "break[ing] and enter[ing] an office or dwelling to gather news," *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991), or scoops obtained by "[c]ore criminal speech such as extortion, bribery, [] perjury," or "[s]peech integral to criminal conduct," *Seals v. McBee*, 898 F.3d 587, 597 n.25 (5th Cir. 2018). But this is not such a case.

Mr. Berge's situation is "an easy one," *Thompson v. Ragland*, 23 F.4th 1252, 1259 (10th Cir. 2022): There is no dispute that the Constitution prohibits taking—or threatening to take—legal action against someone because they published speech that the government dislikes. *See Gericke*, 753 F.3d at 7. And that is all that happened here. Mr. Berge asked questions, and made a video of himself asking those questions, in a public building, with the knowledge of everyone in the video. Then, when he posted that video with his commentary, the defendants suddenly threatened him with legal action under a statute

that—on its face—only applies to secret recordings, despite knowing he never made a secret recording. *See* Mass. Gen. Laws ch. 272 § 99(B)(4). No reasonable official could believe that threatening Mr. Berge with legal action under such circumstances amounted to anything but an impermissible effort to suppress speech.

### C. Qualified immunity does not provide protection outside the split-second context.

This Court should also make clear that qualified immunity does not apply in this case because to apply it in the absence of split-second decisionmaking in dangerous circumstances is to divorce it from the justification from which the judge-made doctrine originated.

1. Congress enacted the law now codified as 42 U.S.C. § 1983 with the explicit purpose of providing a private right of action against state officers who violate federally protected rights. *Felder v. Casey*, 487 U.S. 131, 139 (1988) (the Supreme Court has "repeatedly emphasized [that] 'the central objective of the Reconstruction-Era civil rights statutes . . . is to ensure that individuals whose federal constitutional or statutory rights are abridged may recover damages or secure injunctive relief'" (quoting *Burnett v. Grattan*, 468 U.S. 42, 55 (1984))). Section 1983

20

"provides a uniquely federal remedy against incursions upon rights secured by the Constitution and laws of the Nation, and is to be accorded a sweep as broad as its language." *Id.* (cleaned up). The text speaks of no immunities. *See* Evan Bernick, *It's Time to Limit Qualified Immunity*, Geo. J.L. & Pub. Pol'y: Legal Blog (Sept. 17, 2018), https://www.law.georgetown.edu/public-policy-journal/blog/its-time-tolimit-qualified-immunity/ (Section 1983's "text embodies a foundational constitutional principle: Where there is a right, there must be a remedy"). Indeed, the historical evidence shows that Congress intended for § 1983 to abrogate any common law limitations on the statute's unqualified right to vindicate state-level constitutional violations in federal court. *See* Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101 (forthcoming), *available at* https://tinyurl.com/QIFlawed-Fnd.

But over a century after the remedy's creation, the Supreme Court overrode Congress's judgment out of fear that it created an overly harsh rule that failed to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft*, 563 U.S. at 743. In other words, the Supreme Court created

21

qualified immunity to let officers cross unclear constitutional lines in "the spur (and in the heat) of the moment" without fear of "surviving judicial second-guessing months and years" later. *Atwater v. Lago Vista*, 532 U.S. 318, 347 (2001); *see also Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (admonishing judges to "be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation").

In doing so, the Court engaged in policymaking in usurpation of Congress's role. Even so, the Court did not create qualified immunity to protect officials who had fair warning of their constitutional violations; it provides protection *only* when a reasonable officer could not be "expected to know that certain conduct would violate . . . constitutional rights." *Harlow*, 457 U.S. at 819. Officers are not to be "wholly free from concern for [] personal liability" when they have the chance to deliberate. *Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985). As Justice Thomas recently highlighted, the Supreme Court has *never* explained how or why the rationale for qualified immunity should extend to officers "who have time to make calculated choices about enacting or enforcing constitutional

policies." *Hoggard v. Rhodes*, 594 U.S. __, 141 S. Ct. 2421 (2021) (Thomas, J.) (statement respecting denial of cert.).

The chance to hesitate should (and does) negate the policy underlying qualified immunity. There is no longer a risk of an officer facing some dangerous, split-second scenarios where they might "make reasonable but mistaken judgments" when the unconstitutional act was not a heat of the moment, split second act. *Ashcroft*, 563 U.S. at 743. And when internal deliberations or legal advice should reasonably be able to determine how the law will apply to an official's conduct, there is no reason to treat that official any more leniently than courts do in cases when the law is immediately obvious. *See Hope*, 536 U.S. at 741 ("A general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question[.]" (cleaned up)). Put simply, there is nothing unfair about holding an officer accountable "for actions that he or she knew, or should have known, violated the constitutional rights of the plaintiff." *Crawford-El v. Britton*, 523 U.S. 574, 591 (1998).

2. This case involves no element of the danger or "split-second" decision-making the Supreme Court contemplated to call for additional

protection for officials' unconstitutional acts. Berge recorded the officials openly, in a public building, and exercised his right to post that video with his commentary. Displeased, the officials retaliated hours later by writing a letter threatening him with legal action under a law that—on its face—had no application. *Compare* Mass. Gen. Laws ch. 272 § 99(B)(4) (barring "secret" recording), *with* AA019 (letter explicitly stating that individual knew she was being recorded). Granting immunity under these circumstances advances no policy goal except telling public officials that they are above the law.

### D.   Using a statute in an obviously unconstitutional manner is obviously unconstitutional.

As discussed above, even without factually on-point caselaw, qualified immunity does not shield obviously unconstitutional conduct. This includes the use of a statute in an obviously unconstitutional way.

The Supreme Court has explained (in the context of the exclusionary rule) that officials cannot avoid the consequences of constitutional violations by asserting reliance on a statute "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Michigan v. DeFillippo*, 443 U.S. 31, 38

24

(1979). And this circuit—along with at least six others—has recognized that reliance on a statute authorizing "patently unconstitutional" conduct does not entitle officials to qualified immunity. *Guillemard-Ginorio v. Contreras-Gómez*, 490 F.3d 31, 40–41 (1st Cir. 2007); *see Vives v. City of New York*, 405 F.3d 115, 117–19 (2d Cir. 2005); *Leonard v. Robinson*, 477 F.3d 347, 359, 361 (6th Cir. 2007); *Carey v. Nev. Gaming Control Bd.*, 279 F.3d 873, 881 (9th Cir. 2002); *Cooper v. Dillon*, 403 F.3d 1208, 1220–21 (11th Cir. 2005); *Lederman v. United States*, 291 F.3d 36, 47 (D.C. Cir. 2002).

Courts apply this rule to the criminalization of speech, *see Leonard*, 477 F.3d at 361, and have held that "an officer need not understand the niceties of [constitutional caselaw] to know that [a statute] is unconstitutional," *Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005).

By the same token, no reasonable official needs to understand the niceties of constitutional caselaw to know that it is obviously unconstitutional to threaten punishment pursuant to a facially inapplicable statute in retaliation for protected speech. *See Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994) (no immunity for

"egregious manner" of enforcement, or "exceed[ing] the bounds of the ordinance"). Here, the defendant officials threatened legal action under a facially inapplicable statute, in a letter that itself made obvious the statute's inapplicability, for the sole purpose of chilling Mr. Berge's speech. *Compare* Mass. Gen. Laws ch. 272 § 99(B)(4) (barring "secret" recording), *with* AA019 (letter explicitly stating that individual knew she was being recorded). It is hard to imagine a clearer example of an "egregious manner" of enforcement or "exceed[ing] the bounds of the" statute, so immunity cannot attach.

## II. Judges and scholars nationwide are decrying the type of approach to qualified immunity taken by the district court as an evisceration of Section 1983.

In recent years, there has been a growing, cross-ideological chorus of voices, including Supreme Court Justices,[8] federal judges,[9] and

---

[8] *E.g., Kisela*, 138 S. Ct. at 1162 (Sotomayor, J., dissenting) (quoted in text); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part and concurring in the judgment) (quoted in text); *Crawford-El*, 523 U.S. at 611 (Scalia, J., dissenting) ("[O]ur treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume"); *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring) ("[I]n the context of qualified immunity . . . we have diverged to a substantial degree from the historical standards.").

[9] *E.g., McKinney v. City of Middletown*, 49 F.4th 730, 756–58 (2d Cir. 2022) (quoted in text); *Zadeh v. Robinson*, 928 F.3d 457, 479, 480–81 (5th Cir. 2019) (Willett, J.,

constitutional scholars[10], criticizing qualified immunity's abrogation of Section 1983 and its corrosive effects on the ability of the people to hold officials accountable for the harms they inflict.

Justice Sotomayor recently warned that, even in the split-second Fourth Amendment context, qualified immunity has unjustifiably become "an absolute shield" for officials. *Kisela*, 138 S. Ct. at 1162 (Sotomayor, J., dissenting). Justice Thomas explained that "we have

---

concurring in part) (quoted in text); *Horvath v. City of Leander*, 946 F.3d 787, 801 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part) ("[T]here is no textualist or originalist basis to support a 'clearly established' requirement in § 1983 cases."); *Thompson v. Clark*, 2018 WL 3128975, at *7 (E.D.N.Y. June 26, 2018) ("The legal precedent and policy justifications of qualified immunity, it has been charged, fail to validate its expansive scope"); *Estate of Smart v. City of Wichita*, 2018 WL 3744063, at *18 n.174 (D. Kan. Aug. 7, 2018) ("the court is troubled by the continued march toward fully insulating police officers from trial—and thereby denying any relief to victims of excessive force—in contradiction to the plain language of the Fourth Amendment"); *Manzanares v. Roosevelt Cnty. Adult Detention Ctr.*, 331 F. Supp. 3d 1260, 1294 n.10 (D.N.M. 2018) ("[Q]ualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." (citation omitted)); *Ventura v. Rutledge*, 398 F. Supp. 3d 682, 697 n.6 (E.D. Cal. 2019) ("[T]his judge joins with those who have endorsed a complete re-examination of [qualified immunity] which, as it is currently applied, mandates illogical, unjust, and puzzling results in many cases.").

[10] William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 55–61 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1799–1814 (2018); Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 101, 165–68 (forthcoming), *available at* https://tinyurl.com/QI-Flawed-Fnd; Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. Rev. 885, 912–37 (2014).

diverged from the historical inquiry mandated by the statute [and] have completely reformulated qualified immunity along principles not at all embodied in the common law." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part and concurring in the judgment) (cleaned up).

And Judge Willett of the Fifth Circuit lamented: "To some observers, qualified immunity smacks of unqualified impunity"; "this entrenched, judge-created doctrine excuses constitutional violations by limiting the statute Congress passed to redress constitutional violations." *Zadeh*, 928 F.3d at 479, 480–81 (Willett, J., concurring in part).

Most recently, Judge Calabresi of the Second Circuit cataloged the myriad reasons that "more and more judges have come to recognize[] qualified immunity cannot withstand scrutiny," and that broad readings of the doctrine do not "strike[] the right balance." *McKinney v. City of Middletown*, 49 F.4th 730, 756–58 (2d Cir. 2022) (Calabresi, J., appendix to dissenting opinion) (collecting additional cases).

The district court's decision below embodies the realization of their fears and the doctrine's continued devolution from any grounding in text, history, or purpose. This Court should reject it and explain to lower courts

that qualified immunity is a fair warning standard—not an end-run around government accountability.

**III. To avoid further erosion of Section 1983, this Court should clearly establish the law going forward, even if it grants immunity here (which it should not).**

This court should deny qualified immunity and remand this case to proceed to discovery and trial. But even if it holds that the unconstitutionality of the defendants' actions was not clearly established in March 2022 and grants immunity here, the Court should take this opportunity to clearly establish the law going forward.

While the Court has discretion as to which step of the qualified immunity analysis to address first, "defining constitutional rights and only then conferring immunity[] is sometimes beneficial to clarify the legal standards governing public officials." *Camreta v. Greene*, 563 U.S. 692, 706 (2011). So the Court should make clear, as it has already suggested in multiple cases, that any legal action—or even the threat of it—against an individual for the exercise of First Amendment rights is retaliation that violates the Constitution.

"[R]eflexively granting qualified immunity without first deciding whether the complained-of conduct offends the Constitution . . . results in fewer and fewer courts establishing 'constitutional precedent,' let alone the kind of clearly-established precedent needed to overcome a qualified-immunity claim—a phenomenon known as 'constitutional stagnation.'" *Eves v. LePage*, 927 F.3d 575, 591 (1st Cir. 2019) (en banc) (Thompson, J., concurring); *see also Sabir v. Williams*, 52 F.4th 51, 57 n.3 (2d Cir. 2022) (noting that because "some kinds of constitutional questions do not often come up" outside of Section 1983 cases, it creates a "repetitive cycle of qualified immunity defenses" when courts resolve these cases without addressing the constitutionality of the underlying conduct). Accordingly, courts should "still address the merits question . . . to clearly establish the law and prevent a vicious cycle of shielded misconduct." *Sabir*, 52 F.4th at 57 n.3.

When courts decline to do so, "the qualified immunity situation . . . threatens to leave standards of official conduct permanently in limbo." *Camreta*, 563 U.S. at 706. In such situations, courts may "fail to clarify uncertain questions, fail to address novel claims, [and] fail to give guidance to officials about how to comply with legal requirements"; in

30

turn, "the development of constitutional precedent and the promotion of law-abiding behavior" is frustrated. *Id.* (cleaned up). In short, "if courts refuse to resolve legal claims because the law was not clearly established, then the law will never become clearly established." Jay R. Schweikert, Cato Institute, *Qualified Immunity: A Legal, Practical, and Moral Failure* (2020).

This case presents the type of First Amendment question that is unlikely to arise outside the context of Section 1983 litigation and should be decided on its merits to provide clarity and guidance to public officials and the people they serve. It is not a case that raises any of the circumstances the Supreme Court held in *Pearson v. Callahan* may counsel against a constitutional holding, such as an unrecurring constitutional scenario or one that is so factually sensitive that it can provide no guidance to future litigants. *See* 555 U.S. 223, 237 (2009).

Even if it grants immunity here (which it should not), this Court should take the opportunity to clearly state that an official may never threaten legal action against an individual for exercising their First Amendment right to speak or publish.

## CONCLUSION

The Court should reverse the district court's grant of qualified immunity and remand for further proceedings.

Dated: March 2, 2023                Respectfully submitted,

                                    /s/ Anna Goodman
Ronald London, No. 1183316          Anna J. Goodman, No. 1207113
FOUNDATION FOR INDIVIDUAL               *Lead Counsel*
RIGHTS AND EXPRESSION                Jaba Tsitsuashvili, No. 1207112
700 Pennsylvania Ave. SE            Patrick Jaicomo, No. 1207114
Suite 340                           Anya Bidwell, No. 1207115
Washington, DC 20003                INSTITUTE FOR JUSTICE
(215) 717-3473                      901 North Glebe Road
ronnie.london@thefire.org           Suite 900
                                    Arlington, VA 22203
                                    (703) 682-9320
                                    agoodman@ij.org

                *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2023, I caused the foregoing Brief of Amici Curiae Institute for Justice and the Foundation for Individual Rights and Expression to be filed electronically with the Clerk of the Court using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: March 2, 2023                    /s/ Anna Goodman
                                        *Lead Counsel for Amici Curiae*
                                        *Institute for Justice*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 6432 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2.

2. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

Dated: March 2, 2023

/s/ Anna Goodman
*Lead Counsel for Amici Curiae*
*Institute for Justice*